UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>QINGZHOU WANG,<br>    a/k/a "Bruce," and<br>YIYI CHEN,<br>    a/k/a "Chiron,"<br><br><div align="right">Defendants.</div> | S1 23 Cr. 302 (PGG) |

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' RULE 29 AND 33 MOTIONS**

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Alexander Li
Kevin Sullivan
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 1

   I.    Procedural History ...................................................................... 1

   II.   The Evidence at Trial ................................................................. 3

       A.    The Government's Case .................................................. 3

            1.    Wang, Chen, and Yang's Roles in the Conspiracy .............. 3

            2.    April-May 2022:  Chen Creates Amarvel Biotech Websites
                Advertising Fentanyl and Concealed Packaging .................................. 4

            3.    November 2022–January 2023:  Wang and Yang Ship
                Fentanyl and Methamphetamine Precursors to New York .................. 5

            4.    March 2023:  Wang and Chen Meet with CS Gil in
                Bangkok ......................................................................... 6

            5.    April-May 2023:  Wang, Chen, and Yang Ship Fentanyl-
                Related Precursors to California .......................................... 8

            6.    June 2023:  Wang and Chen Meet with CS Gil in Fiji ...................... 11

       B.    The Defense Case ......................................................... 13

ARGUMENT .......................................................................................... 14

   I.    Applicable Law .......................................................................... 14

   II.   Discussion ................................................................................. 17

       A.    The Evidence Supports Wang's Conviction for Importing
             Methylamine .................................................................. 17

       B.    The Evidence Supports Chen's Convictions for Conspiring to
             Import 1-Boc-4-AP and Conspiring to Commit Money Laundering............. 20

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ......................................................................................... 15

*McFadden v. United States*,
    576 U.S. 186 (2015) .................................................................................... 19, 23

*United States v. Aguilar*,
    585 F.3d 652 (2d Cir. 2009) ............................................................................ 15

*United States v. Anderson*,
    747 F.3d 51 (2d Cir. 2014) .............................................................................. 15

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020) ............................................................................ 17

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ............................................................................ 16

*United States v. Dambelly*,
    714 F. App'x 87 (2d Cir. 2018) ....................................................................... 20

*United States v. Demott*,
    906 F.3d 231 (2d Cir. 2018) ............................................................................ 19

*United States v. Desena*,
    260 F.3d 150 (2d Cir. 2001) ............................................................................ 16

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001) ............................................................................ 16

*United States v. Frampton*,
    382 F.3d 213 (2d Cir. 2004) ............................................................................ 20

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002) .............................................................................. 15

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999) ............................................................................ 15

*United States v. James*,
    239 F.3d 120 (2d Cir. 2000) ...................................................................... 16, 21

*United States v. Landesman*,
    17 F.4th 298 (2d Cir. 2021) ............................................................................ 16

*United States v. Matthews*,
    20 F.3d 538 (2d Cir. 1994)..............................................................................15

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 2001)............................................................................16

*United States v. Middlemiss*,
    217 F.3d 112 (2d Cir. 2000)............................................................................16

*United States v. Morrison*,
    153 F.3d 34 (2d Cir. 1998)..............................................................................16

*United States v. Ng Lap Seng*,
    934 F.3d 110 (2d Cir. 2019)............................................................................15

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992)..........................................................................17

*United States v. Santos*,
    541 F.3d 63 (2d Cir. 2008)..............................................................................16

*United States v. Walker*,
    191 F.3d 326 (2d Cir. 1999)............................................................................15

**Rules**

Fed. R. Crim. P. 29 .............................................................................................14, 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to: (1) defendant Qingzhou Wang's post-trial motion, pursuant to Federal Rule of Criminal Procedure 29, for acquittal on Count Four of the Superseding Indictment, ("Wang Mot.," Dkt. 135); and (2) defendant Yiyi Chen's post-trial motions, pursuant to Rules 29 and 33, for acquittal or, in the alternative, for a new trial on Counts Two and Five of the Superseding Indictment, ("Chen Mot.," Dkt. 141). Because the evidence at trial conclusively established Wang's guilt on Count Four and Chen's guilt on Counts Two and Five beyond a reasonable doubt, and because a reasonable jury could and did so find, the motions should be denied.

## BACKGROUND

### I.    Procedural History

On June 22, 2023, a grand jury returned Indictment 23 Cr. 302, which charged the defendants in five counts. (Dkt. 7). Count One charged Wang, Chen, FNU LNU, a/k/a "Er Yang," a/k/a "Anita" ("Yang"), and Hubei Amarvel Biotech Co., Ltd., a/k/a "AmarvelBio," ("Amarvel Biotech") with conspiracy to manufacture, distribute, possess with intent to manufacture, and possess with intent to distribute fentanyl and an analogue of fentanyl, in violation of 21 U.S.C. §§ 846, 813(a), and 841(b)(1)(A). Count Two charged Wang, Chen, Yang, and Amarvel Biotech with conspiracy to manufacture and distribute 1-boc-4-AP, intending, knowing, and having reasonable cause that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 841(a)(1), 960(d)(1), 960(d)(3), and 21 C.F.R. § 1310.02(a)(39). Count Three charged Wang, Yang, and Amarvel Biotech (but not Chen) with manufacturing and distributing 1-boc-4-AP, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 841(a)(1), 960(d)(1), and 960(d)(3), 18 U.S.C. § 2, and 21 C.F.R. § 1310.02(a)(39). Count Four charged Wang, Yang, and

Amarvel Biotech (but not Chen) with manufacturing and distributing methylamine, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960(d)(7), 18 U.S.C. § 2, and 21 C.F.R. § 1310.02(a)(14).  And Count Five charged Wang, Chen, Yang, and Amarvel Biotech with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and (a)(2)(A).

On June 8, 2023, Wang and Chen were arrested in Fiji by Fijian law enforcement authorities, ordered expelled from that country, and transported by Drug Enforcement Administration ("DEA") agents to Honolulu, Hawaii.  On June 9, 2023, Wang and Chen were presented in the United States District Court for the District of Hawaii and subsequently transferred to the Southern District of New York for prosecution.

On October 3, 2024, a grand jury returned Superseding Indictment S1 23 Cr. 302 (the "Superseding Indictment"), which added "fentanyl-related substance" and a corresponding citation to 21 C.F.R. § 1308.11(h)(30)(i) to Count One.  (Dkt. 79).

On January 13, 2025, trial commenced on the Superseding Indictment.  On January 27, 2025, after the close of the Government's case, Wang and Chen moved for acquittal pursuant to Rule 29(a):  (1) as to all counts, for lack of venue; (2) as to Count One, for lack of evidence establishing an agreement to manufacture the fentanyl-related substance ortho-methylfentanyl; (3) as to Counts Three and Four, for lack of evidence establishing Wang's participation in the January 2023 shipment of 1-boc-4-AP and methylamine; and (4) as to Count Four, because the lab-tested quantity of methylamine did not trigger a regulatory duty to report.  (Dkt. 127; Tr. 1118).  The Court denied the Rule 29 motion in its entirety.  (Tr. 1259–67).  On January 29, 2025, the jury returned a unanimous verdict of not guilty on Count One and guilty on Counts Two through Five. (Tr. 1542–46).  As to Counts Two and Three, the jury also found that Wang and Chen (in Count

Two) and Wang (in Count Three) knew or had reasonable cause to believe that the 1-boc-4-AP would be used to manufacture fentanyl. (Tr. 1543–44).

On February 12, 2025, Wang and Chen filed the instant motions.

## II.    The Evidence at Trial

### A.    The Government's Case

At trial, the Government called 12 witnesses and introduced 230 exhibits into evidence. The Government's evidence established, beyond a reasonable doubt, that beginning in or about November 2022, Wang and Yang negotiated, sold, and shipped approximately one kilogram each of the fentanyl precursors 1-boc-4-AP and 1-boc-4-piperidone, and approximately 894 grams of the methamphetamine precursor methylamine, to a DEA confidential source ("CS Jose")[1] posing as a Mexican drug trafficker in New York. Wang, Chen, and Yang — all executives and employees of Amarvel Biotech — then planned to ship even larger quantities of 1-boc-4-AP from China to the United States, even though they were under the impression that Americans had already died after consuming fentanyl produced from the sample chemicals. Wang, Chen, and Yang requested and accepted payment in cryptocurrency, some of which was delivered to a cryptocurrency wallet held directly by Wang in China.

### 1.    Wang, Chen, and Yang's Roles in the Conspiracy

The evidence at trial established that Wang, Chen, and Yang each held key roles within the conspiracy. Wang was the "boss," as Chen, Yang, and Wang himself acknowledged. (Tr. 168, 396, 1082; *see also* GX 401 at 42 (Yang: "This is the telephone number of my boss, Mr. Wang"); GX 502C-T (Chen: "My boss said, of course, we will be pleasure to help you for this technology."); GX 806-T at 54 (Wang: "Director Wang has the final say over here.")). Chen was

---

[1] CS Jose testified at trial under the pseudonym "Antonio Garcia." (Tr. 141, 146).

the marketing manager, as she told a DEA confidential source ("CS Gil")[2] at a meeting in Bangkok, Thailand on March 23, 2023.  (Tr. 413; GX 502B-T (Chen:  "I'm taking care of marketing."); *see also* GX 741 and 742 (business cards identifying Chen as "Sales Manager" for Amarvel Biotech's sister company, Wuhan Wingroup Pharmaceutical Co. Ltd. ("Wingroup Pharmaceutical")); GX 301A–G (domain name registration records identifying Chen as registrant of website domains operated by Amarvel Biotech and Wuhan Pharmaceutical)).  And Yang was the sales representative who negotiated the precursor chemical transactions with CS Jose.  (Tr. 147; *see also* GX 401 (chat messages between Yang and CS Jose)).

### 2.    April-May 2022:  Chen Creates Amarvel Biotech Websites Advertising Fentanyl and Concealed Packaging

In April and May 2022, Chen registered six web domains operated by Amarvel Biotech. (GX 301A–F; *see also* Tr. 935–36, 950–51, 957–58, 963–64, 967, 971, 978, 1212–13, 1217–18, 1220–24).  Each of these websites listed for sale 1-boc-4-AP and another fentanyl precursor, 1-boc-4-piperidone.  (GX 203, 204, 205, 207, 208, 211, 212, 214, 215, 217, 218, 219, 220; *see also* Tr. 939–45, 951–53, 960–62, 964–66, 972–82).  Several of Chen's websites, including Amarvel Biotech's principal website "amarvelbio.com," also featured methylamine.  (GX 202, 209, 213; *see also* Tr. 936–37, 955–56, 962–63).  Most of the product listing webpages for 1-boc-4-AP explicitly advertised that chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives," (GX 208, 212, 215, 218; *see also* Tr. 954, 961–62, 965–66, 975–77), with one webpage simply replacing the "Fentanyl" with "F," (GX 204 ("intermediate in the preparation of F derivatives"); *see also* Tr. 941–42).  Chen's websites also advertised Amarvel Biotech's ability to ship chemicals using false or concealed packaging, including a promotional video on Amarvel

---

[2] CS Gil testified at trial under the pseudonym "Jorge Rodriguez."  (Tr. 387, 395).

Biotech's principal website depicting various forms of fake packaging including engine oil, dog feed, beeswax, and nuts. (GX 206A; *see also* GX 208, 209, 210, 211, 212, 217, 218, 219, 220; Tr. 945–48, 953–56, 958–62, 972–83). Images, video, and text — including a text file describing 1-boc-4-AP as an "[i]ntermediate in the preparation of Fentanyl derivatives" — matching those published on the websites were also found on Chen's laptop, thus cementing her knowledge, and indeed authorship, of the incriminating content published online. (*See, e.g.*, GX 711 (image of "Nature's Nuts" packaging); GX 719 (photo of 1-boc-4-piperidone powder); GX 714 (video of 1-boc-4-piperidone powder); GX 745 (text of 1-boc-4-AP product listing); *see also* Tr. 1000–04, 1012–13).

### 3.    November 2022–January 2023:  Wang and Yang Ship Fentanyl and Methamphetamine Precursors to New York

In November 2022, CS Jose contacted Amarvel Biotech by WhatsApp as part of a DEA undercover operation. (Tr. 148–49). Yang responded on behalf of the company, and she agreed to sell an initial sample of one kilogram each of 1-boc-4-AP, 1-boc-4-piperidone, and methylamine to CS Jose in Manhattan, New York. (GX 401 at 11; Tr. 148–49, 165–67). CS Jose explicitly told Yang that his organization was making fentanyl, (GX 401 at 5, 9, 20; Tr. 160, 163, 174), and Yang assured CS Jose that he did not need to "worry about payment issues being traced, as most of our customers use Bitcoin and Western Union for payment and are always safe," (GX 401 at 9; Tr. 163–64). Yang proposed that CS Jose pay with cryptocurrency from New York. (GX 401 at 10; Tr. 164). After confirming receipt of the payment in the cryptocurrency USDT, (GX 401 at 16; Tr. 169–70), Yang provided CS Jose with regular updates on the shipment of the chemicals, including customs clearance and a photo of a FedEx shipping label, (GX 401 at 22–25; Tr. 175–79). On January 18, 2023, the DEA retrieved a package bearing that same FedEx label from a FedEx facility in Brooklyn, New York. (GX 1004; Tr. 309–10). DEA forensic chemist Matthew

Sider examined the contents of the package, and found it contained approximately one kilogram of 1-boc-4-AP, approximately one kilogram of 1-boc-4-piperidone, and approximately 894 grams of methylamine.  (Tr. 322, 324, 327).

During their discussions of the sample purchase, Yang repeatedly referenced the involvement of her "boss" in approving the pricing and shipment of the chemicals, as well as in confirming receipt of the cryptocurrency.  (GX 401 at 13, 15–16; Tr. 168–70).  Yang later identified her "boss" as "Bruce Wang."  (GX 401 at 43; Tr. 168, 214).  After the January 2023 shipment, Yang agreed to arrange a meeting in Bangkok with her "boss" Wang and her "colleague" Chen to discuss the long-term supply of chemicals to CS Jose's organization, (GX 401 at 42–43), but advised that her "boss" first wanted $5,000 as an advance payment towards the next order, (GX 401 at 35; Tr. 194).  Yang proposed that CS Jose again "pay with USDT in US."  (GX 401 at 36; Tr. 195).  CS Jose agreed to the payment, Yang acknowledged that her "boss" received $4,972 in USDT, and cryptocurrency exchange records confirmed the recipient of the payment was Wang in China.  (GX 401 at 39; GX 304-T; Tr. 194, 197–98).

### 4.    March 2023:  Wang and Chen Meet with CS Gil in Bangkok

On March 23, 2023, Wang and Chen met in Bangkok with CS Gil, who was posing as CS Jose's boss in a Mexican drug cartel.  (Tr. 389, 406–07).  Before the meeting, Wang created a private group chat with Chen and Yang.  (GX 806-T; Tr. 1067–78).  In the private group chat, Yang informed Wang and Chen that she had been communicating with a "Mexican client" named "Jose."  (GX 806-T at 2, 12; 1068–69).  At Chen's request, (GX 806-T at 14; Tr. 1069), Yang forwarded to Chen her prior WhatsApp chats with CS Jose, (GX 807-T; Tr. 1069–72).  These forwarded messages included the specific Chemical Abstracts Service ("CAS") numbers and pricing of the three chemicals in the sample shipment (*i.e.*, 1-boc-4-AP, 1-boc-4-piperidone, and methylamine), as well as CS Jose's statement that "[w]e make some ice [*i.e.*, methamphetamine]

and fentanyl," which would be "tested whit [sic] some clients in NY and LA." (GX 807-T at 15, 20–21; Tr. 1073–74).

During the meeting in Bangkok, which was recorded, CS Gil explicitly told Wang and Chen that he planned to open a laboratory in New York to make fentanyl. (GX 502B-T; Tr. 412–13). Translating from English into Mandarin, Chen told Wang that "he wants to open a chemical laboratory in New York" and to "use this product to make fentanyl." (GX 502B-T). CS Gil told Wang and Chen that the fentanyl he made from Amarvel Biotech's prior shipment was "too strong" and that "several Americans" had died as a result. (GX 502C-T; Tr. 415–16, 469). CS Gil asked for assistance with improving his formula for fentanyl. (GX 502C-T, Tr. 469). After Chen translated CS Gil's statements, Wang responded in Mandarin that "we have many clients in Mexico and the United States" who "know the method," and that the company also had its own ability to find "professional technical guidance." (GX 502C-T). Wang assured CS Gil that "after we start working together, I will use my capacity to help you." (GX 502C-T). Wang and Chen then privately discussed, in Mandarin, the possibility of sharing the formula for fentanyl using an application that would cause the message to "disappear in a few days." (GX 502C-T).

Wang and Chen also described their success in smuggling large quantities of chemicals into the United States without detection. For example, CS Gil explained that he was setting up labs in the United States because "sometimes I lose product" while moving fentanyl from Mexico to the United States "because of the legality behind it." (GX 502D-T; Tr. 476). Translating into Mandarin, Chen told Wang: "[H]e used to produce in Mexico, and then ship it to the United States for sale. However, when crossing the border, it would be seized . . . ." (GX 502D-T). In response, Wang told Chen that CS Gil's idea of setting up a fentanyl laboratory in the United States was "very correct" because "in America, our logistics are fastest." (GX 502D-T). Wang explained

that "regarding the customs risk in the U.S., about 99% can be cleared," (GX 502D-T), and that "perhaps 1 out of 1000 orders might be detained," (GX 502M-T). Wang added that "[i]f there are items failed to pass through customs, we may still bring the goods out through some other methods." (GX 502D-T). Chen told CS Gil that "[a]s far this month . . . we ship already 7 tons to America," and that CS Gil could "add 3 tons or 5 tons, it's not a problem because to America it's quite safe." (GX 502M-T; Tr. 499–500).

At one point during the March 2023 meeting in Bangkok, Chen explained that Amarvel Biotech had two bosses, Wang and "another one" in Japan. (GX 502I-T; Tr. 488–89). When CS Gil asked to meet the other boss, Wang placed a video call to "Mr. Xia" in the presence of CS Gil. (Tr. 489–90). During the video call, Wang told Xia, in Mandarin: "[T]he client . . . said to meet another boss, the boss in Japan. And then [I told him] I'm, I'm the boss in charge of this piece of business." (GX 502I-T). At the end of the meeting in Bangkok, Chen told CS Gil that Yang would "communicate with you" regarding CS Gil's upcoming order of precursor chemicals. (GX 502Q-T; Tr. 536–37). When CS Gil suggested Yang write in code, such as by using "F for fentanyl," Chen replied, "maybe she will not write the name of the product." (GX 502Q-T).

### 5.  April-May 2023:  Wang, Chen, and Yang Ship Fentanyl-Related Precursors to California

After the March 23, 2023 meeting in Bangkok, Chen created a group chat with Wang, Yang, CS Jose, CS Gil, and later Xia. (GX 402; Tr. 539–40). CS Gil asked in the group chat for the products that "would be [b]est to produce . . . [b]est fentanyl." (GX 402 at 2; Tr. 541–42). Consistent with Chen's directive in Bangkok, however, the conspirators attempted to keep the group chat clear of explicit drug talk, instead reserving that task for Yang in direct communications with CS Jose. For example, on March 28, 2023, Yang sent a chart to CS Jose listing 1-boc-4-AP and 1-boc-4-piperidone with the corresponding application "[f]entanyl," and simultaneously sent

an identical chart to the group chat with the "[f]entanyl" column removed.  (*Compare* GX 401 at 46 *with* GX 402 at 3; *see also* Tr. 223–24).  Yang explained in the group chat that "[i]n the table are our best-selling staple products" and "I will confirm the other details with Jose in private." (GX 402 at 4; Tr. 224–25).  Similarly, on March 30, 2023, after Gil asked in the group chat to "[b]uy everything from you . . . [t]o get final product," Chen replied, "I've described clearly your requires [sic] and our meeting conversations to [Yang], she will handle it," followed by a winking emoji.  (GX 402 at 6; Tr. 552–53).

On April 10, 2023, Wang and Chen, along with Xia, participated in a recorded video call with CS Gil.  (Tr. 554, 1227).  CS Gil explained that he wanted to receive the next order of chemicals in New York to make "50-55 kilos of the final product," and Chen replied by inquiring whether "your New York lab . . . is under construction?"  (GX 503A-T; Tr. 556–57).  Chen then told Wang, in Mandarin, that CS Gil "wants to produce the final product weighing 50-55 kilograms and will provide us with a form specifying the raw materials he wants."  (GX 503A-T).  Wang replied, in Mandarin, "No problem."  (GX 503A-T).

On April 11, 2023, CS Gil placed in the group chat an order for three fentanyl precursors: 50 kilograms of 1-boc-4-AP, 100 kilograms of propionyl chloride, and 60 kilograms of 2-(bromoethyl)benzene.  (GX 402 at 8; Tr. 234–35, 567–68).  As DEA chemist Dr. Christine Herdman explained at trial, these three chemicals can be used together to synthesize fentanyl.  (Tr. 811–12).  The next day, Yang responded in the group chat with an invoice on Amarvel Biotech letterhead listing each chemical by name, CAS number, and quantity.  (GX 402 at 10; Tr. 237–38, 568–69).  The invoice provided for delivery to a "[w]arehouse in USA near NY" and indicated a total price of $45,800, payable in USDT (among other payment methods), less the approximately $4,973 paid prior to the Bangkok meeting.  (GX 402 at 10; Tr. 237–38, 571).  On April 14, 2023,

Yang confirmed receipt of the remaining balance. (GX 402 at 12). Cryptocurrency exchange records indicate that the recipient of the transfer was again Wang in China. (GX 304-T; Tr. 242–43).

After confirming the order, Yang informed CS Jose that the 1-boc-4-AP was "very special" and required additional "production time" — *i.e.*, that it was out of stock. (GX 401 at 58–59; Tr. 240). Yang proposed instead sending 1-boc-4-piperidone, and even offered to "provide the method of making ANPP" with that precursor. (GX 401 at 59; Tr. 241). As Dr. Herdman explained, ANPP is an immediate precursor to fentanyl — meaning it is only a single chemical reaction away from fentanyl — and ANPP can indeed be synthesized from 1-boc-4-piperidone. (Tr. 802–03, 807, 816–17). After CS Jose expressed frustration, (GX 401 at 58; Tr. 239–40), Yang advised that the 1-boc-4-AP was back in stock and available to ship after all, (GX 401 at 60; GX 402 at 11–12; Tr. 241).

On April 28, 2023, Yang notified CS Jose that the 210-kilogram fentanyl precursor shipment had arrived at a warehouse near Los Angeles, California. (GX 401 at 61–62; Tr. 244). In the group chat, Yang explained that "New York, the United States, has been strict in checking the precursors of the 'final product' some time ago, so for the sake of safety, this time it is sent to California." (GX 402 at 18; Tr. 246–47, 572). CS Jose testified that he understood Yang to be "saying basically they are afraid that the customs in New York would seize the merchandise." (Tr. 247). Similarly, CS Gil testified that he understood Yang to mean that "due to the strict checking by the law enforcement in New York . . . this time they were going to send it to California for safety reasons." (Tr. 572–73).

On May 5, 2023, the DEA retrieved the shipment of precursor chemicals from the warehouse in California. (GX 1006; Tr. 750–51). The eight boxes in the shipment filled the bed

of a pickup truck, (GX 106), and several of the boxes bore warning labels falsely depicting batteries, (GX 4A, 4C, 107, 125; Tr. 753, 756, 768).  DEA forensic chemist Fracia Martinez tested the contents of the shipment and determined that it contained approximately 105 kilograms of propionyl chloride, approximately 68 kilograms of 2-(bromoethyl)benzene, and approximately 50 kilograms of ortho-methyl-N-boc-4-AP.  (Tr. 771, 776–78; *see also* Tr. 809, 819 (alternate chemical names)).  Dr. Herdman testified that ortho-methyl-N-boc-4-AP is substantially similar in chemical structure to 1-boc-4-AP, differing only by the substitution of a single hydrogen atom in 1-boc-4-AP with a methyl group.  (Tr. 820).  Dr. Herdman further explained that ortho-methyl-N-boc-4-AP can be used in the same manner as 1-boc-4-AP to synthesize a substance called ortho-methylfentanyl, which — like its precursor ortho-methyl-N-boc-4-AP — differs from fentanyl only by the substitution of a single hydrogen atom in fentanyl with a methyl group.  (Tr. 821–22).  As defense chemist Heather Harris conceded, ortho-methylfentanyl is a fentanyl analogue and a fentanyl-related substance.  (Tr. 1104, 1106).

### 6.    June 2023:  Wang and Chen Meet with CS Gil in Fiji

After the May 2023 shipment of approximately 210 kilograms of fentanyl-related precursors to the United States, Wang, Chen, and Yang discussed organizing another in-person meeting in Fiji to finalize even larger shipments of fentanyl precursors.  (Tr. 583).  In advance of the in-person meeting, Wang and Chen held a recorded video call on May 9, 2023 with CS Gil and another DEA confidential source, who attended the call from Manhattan and posed as CS Gil's investor.  (Tr. 576–77, 587).  Xia also joined the video call.  (Tr. 576, 578).  CS Gil explained that he wanted 15 times the quantity of each chemical in the May 2023 order, for a total of more than 3 tons of fentanyl precursors.  (GX 504A-T; Tr. 579–80).  Wang stated that the customer should first "pay a deposit" before they would meet in Fiji.  (GX 504A-T; Tr. 582–83).  Yang negotiated a deposit of $20,000 in USDT and confirmed receipt of the funds on May 16, 2023.  (GX 402 at

27–28).  Cryptocurrency exchange records indicate that the recipient of the transfer was "Bing Bing Xia."[3]  (DX A; Tr. 667, 673–74, 678–80).

On June 8, 2023, Wang and Chen met with CS Gil in Fiji.  (Tr. 430–32).  During the meeting, which was recorded, Wang and Chen discussed the multi-ton shipment and their newly-heightened concerns about detection in the United States.  For example, Wang asked Chen, in Mandarin:  "If it was inspected by the U.S. Customs, what would happen after that? . . .  [I]t could potentially trigger . . . a reexamination . . . like Shuokang."  (GX 505A-T; Tr. 1049).  Wang was apparently referring to Wuhan Shuokang Biological Technology Co., Ltd. ("Shuokang"), a Chinese company that Chen had previously researched.  (GX 253-T; Tr. 1046).  Specifically, on April 15, 2023, as reflected in her phone's browser history, Chen performed a Google search for "voachina fentanyl."  (GX 802; Tr. 1038–39).  Chen then viewed three Voice of America articles describing the United States Government's efforts to combat fentanyl trafficking.  (GX 802, 251-T, 252-T, 253-T; Tr. 1040–47).  One of those articles explained that the United States had sanctioned Shuokang for supplying "Mexican drug cartels with precursors chemicals for the production of illegal fentanyl intended for the U.S. market," and had also indicted three representatives of Shuokang in federal court.  (GX 253-T; GX 1045–47).  Consistent with having read and understood this report, Chen explained to CS Gil at the meeting in Fiji that "recently American government uh seized, some Mexican, Mexican group and uh, they, they follow the route to China" and found "[our] [c]ompetitor in China," which was "bad news for us."  (GX 505B-T).  Chen asked CS Gil "[i]f our products blocked by the police," whether CS Gil had any way to get the products out.  (GX 505C-T; Tr. 605–06).

---

[3] The interpreter translated the name as "Xia Bing Bing," specifying "[l]ast name Xia" and "[f]irst name Bing Bing."  (Tr. 679).

### B.      The Defense Case

Wang and Chen each called one witness.

Wang called Ms. Harris, a chemistry professor and consultant.  (Tr. 1085).  Ms. Harris testified that propionyl chloride, 2-(bromoethyl)benzene, and ortho-methyl-N-boc-4-AP — *i.e.*, the three chemicals that arrived in California in May 2023 — are not listed chemicals in the United States.  (Tr. 1091).  Ms. Harris acknowledged that these chemicals could be used to synthesize the fentanyl analogue ortho-methylfentanyl, but contended that the process of synthesis would require the "right reagents" and the "right chemical environment."  (Tr. 1089, 1104).  Ms. Harris further testified that as a general matter, "[c]hemical synthesis is not easy."  (Tr. 1099).  On cross-examination, however, Ms. Harris admitted that 1-boc-4-AP — *i.e.*, one of the chemicals delivered to New York in January 2023 and included on the April 2023 invoice — is a listed chemical that is "difficult to acquire" and could be useful in making fentanyl.  (Tr. 1107–08).  Ms. Harris also agreed with Dr. Herdman that 1-boc-4-AP, propionyl chloride, and 2-(bromoethyl)benzene "all contribute to the chemical structure of fentanyl."  (Tr. 1107).

Chen testified on her own behalf.  (Tr. 1125).  Chen claimed that she worked at various times for four different companies, including Amarvel Biotech and Wuhan Pharmaceutical, in which Fengzhi Xia invested.  (Tr. 1129).  Chen admitted that for all of these companies, she "buil[t] these website[s] on the servers and appl[ied] for domain names," but claimed that each company's salespeople (and not Chen) were "responsible for uploads of the product information."  (Tr. 1135–36).  Chen specifically claimed that she did not recognize product webpages for 1-boc-4-AP, 1-boc-4-piperidone, and methylamine on various Amarvel Biotech websites, (Tr. 1136–40), including a product page on Amarvel Biotech's primary website displaying a photograph of 1-boc-4-piperidone powder that appears to be substantially identical to a photograph found on Chen's laptop, (*compare* GX 203 *with* GX 719).  Chen testified that she only temporarily worked at

Amarvel Biotech, when, on account of her English proficiency, she was assigned to "assist Mr. Wang with translation" for a week in March 2023 and again for another week in June 2023. (Tr. 1145–46, 1204–05). These temporary assignments coincided with her being recorded on camera in Bangkok and Fiji. (Tr. 1147–48).

Chen testified that she understood her role at the Bangkok meeting to be an "[i]nterpreter," with no responsibility "regarding the business part of the meeting." (Tr. 1184). Chen admitted receiving some "partial communication" with the customer before the Bangkok meeting — apparently referring to Yang's forwarded messages describing CS Jose's prior purchase of chemicals and purported use of those chemicals to "make some ice and fentanyl," (GX 807-T at 15, 20–21) — but claimed she was "too busy" and "didn't really review it." (Tr. 1185). Chen testified that when CS Gil discussed fentanyl at the Bangkok meeting, she understood him to be saying that "he wanted to build grand labs in New York, and he wanted to find professional team to assist to him to develop a better, safer product that way he could save lives." (Tr. 1193). Chen admitted that she had read the three Voice of America articles before attending the meeting with CS Gil in Fiji, but claimed the articles were "very confusing." (Tr. 1196). When asked what she understood CS Gil to mean, "in light of those articles," when CS Gil said in Fiji "that he was going to be setting up a lab in New York to make fentanyl," Chen testified that she understood CS Gil "wanted better technical support so that he could make better and safer fentanyl." (Tr. 1248–49). Chen claimed that even in Fiji, she did not think that CS Gil "was intending to violate the laws of the United States." (Tr. 1249).

## ARGUMENT

### I.    Applicable Law

Before a jury returns its verdict, a defendant may move for a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). If

the defendant is convicted, he may again "move for a judgment of acquittal, or renew such a motion." Fed. R. Crim. P. 29(c)(1). "A defendant challenging the sufficiency of the evidence supporting a conviction," however, "faces a heavy burden." *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002).[4] "A Rule 29 motion does not provide the trial court — or, on review, the court of appeals — with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Anderson*, 747 F.3d 51, 59–60 (2d Cir. 2014). Rather, "a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In considering a Rule 29 motion, the court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999). The court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). The court "may reverse a guilty verdict only if evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Ng Lap Seng*, 934 F.3d 110, 130 (2d Cir. 2019).

---

[4] Unless otherwise specified, all case quotations omit internal quotation marks, citations, ellipses, and prior alterations.

"[T]o avoid usurping the role of the jury," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), the court must "resolve all issues of credibility in favor of the jury's verdict," *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001). "[T]he credibility of witnesses is the province of the jury, and [the court] simply cannot replace the jury's credibility determinations with [its] own." *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000). Moreover, the court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998), because the "task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). The deference afforded to the jury's verdict is "especially important" in a conspiracy case, because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008).

Federal Rule of Criminal Procedure 33 permits the court, "[u]pon the defendant's motion," to "vacate any judgment and grant a new trial if the interest of justice so requires." "[T]he trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021). "Granting Rule 33 motions is not favored and is done with great caution." *United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000). "There

must be a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

"[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020). Under this standard, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 188. "To the contrary, absent a situation in which the evidence was patently incredible or defied physical realities, or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must defer to the jury's resolution of conflicting evidence." *Id.* "And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* at 189.

## II.    Discussion

### A.    The Evidence Supports Wang's Conviction for Importing Methylamine

Wang moves pursuant to Rule 29 for acquittal on Count Four (manufacturing and distributing methylamine, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States). Wang first argues that "[t]he government provided no evidence linking Mr. Wang to the January 2023 methylamine shipment." (Wang Mot. at 1). Wang further argues that "the government provided no evidence that Mr. Wang had any knowledge of methylamine whatsoever." (Wang Mot. at 1).

Despite disclaiming reliance on his pre-verdict Rule 29 motion, (Wang Mot. at 1), Wang's first argument retreads old ground. As the Court observed in denying his pre-verdict Rule 29 motion, Yang — who organized the January 2023 shipment of methylamine, 1-boc-4-AP, and 1-boc-4-piperidone — "repeatedly referenced her 'boss' in approving that order." (Tr. 1265 (citing

17

GX 401 at 15–16)).  Yang later told CS Jose that her "boss" was "Bruce Wang," (Tr. 1265 (citing Tr. 168); *see also* GX 401 at 42–43), and Wang himself declared that he had the "final say" at Amarvel Biotech, (Tr. 1265 (citing GX 806-T at 54)).  On this record, the Court concluded, "a reasonable juror could infer that Wang approved the January 2023 shipment."  (Tr. 1265).  Wang speculates that Yang could have been referring to "Mr. Xia, the boss in Japan," (Wang Mot. at 2),[5] rather than Wang, but the jury was not required to credit that speculation in contravention of the clear evidence to the contrary.  Wang stated at the Bangkok meeting that Mr. Xia "is not in charge of this area anymore," that "I basically handle the work in this area," and that "I'm the boss in charge of this piece of business."  (GX 502I-T).  Wang similarly wrote Chen and Yang that "Director Xia is not responsible for any actual work, and Director Wang has the final say over here."  (GX 806-T at 54; Tr. 1082).  There is nothing unreasonable about crediting Wang's own words.

Wang's second argument fares no better.  As Wang concedes, (Wang Mot. at 1), the Government could prove knowledge of the listed substance by showing either that (1) he knew the chemical was "methylamine," or (2) he knew the chemical was "controlled or regulated by the United States federal drug laws," (Tr. 1514).  The jury had ample evidence of both.  In her chat messages with CS Jose, Yang specified the CAS numbers and prices of each of the three chemicals in the January 2023 shipment.  (GX 401 at 13; Tr. 167).  That included the CAS number 74-89-5, which is methylamine.  (Tr. 167, 800; *see also* GX 202 (Amarvel Biotech webpage identifying methylamine by name and CAS number)).  A reasonable juror could therefore infer that when

---

[5] Wang also asserts that "payment for the January 2023 order was sent to a person known as Xia Guang, as provided in the cryptocurrency records in the government's discovery," (Wang Mot. at 2), but he did not present this evidence to the jury.  Nor, in any event, does this payment record negate the extensive proof that Wang approved the January 2023 shipment.

Yang told CS Jose she would "confirm [payment] with my boss and apply for shipment," (GX 401 at 15; Tr. 169–70), and would "apply for delivery to my boss," (GX 401 at 16; Tr. 170), Yang asked Wang to approve shipment of those specific three chemicals, including methylamine. Indeed, at the Bangkok meeting, Wang demonstrated his familiarity with the January 2023 shipment by telling Chen that the "supplementary materials" — apparently referring to precursor chemicals — that CS Gil should buy "are among the ones he *bought*," adding that "[m]ethylamine is the supplementary material." (GX 502O-T (emphasis added); *see also* GX 502J-T (Wang again referring to methylamine and the "three products")). This evidence further supports the inference that Wang approved the January 2023 shipment of methylamine, 1-boc-4-AP, and 1-boc-4-piperidone.

A reasonable juror could also infer that Wang knew the chemicals in the January 2023 shipment were controlled or regulated by the United States federal drug laws because he stated in Bangkok that Amarvel Biotech had been successful in shipping ton-quantities of chemicals to the United States, (GX 502M-T), that "perhaps 1 out of 1000 orders" to the United States "might be detained," (GX 502M-T), and that "[i]f there are items failed to pass through customs, we may still bring the goods out through some other methods," (GX 502D-T). These statements by Wang, which are consistent with Amarvel Biotech's online advertising of fake and concealed packaging, demonstrate Wang's knowledge that the substances ordered by the DEA confidential sources were "subject to seizure at customs." *McFadden v. United States*, 576 U.S. 186, 192 n.1 (2015). "That kind of evidence supports the knowledge element because it raises an inference that the defendant was aware of the substance's legal status," *United States v. Demott*, 906 F.3d 231, 252 (2d Cir. 2018) (Wesley, J., concurring) — *i.e.*, that the substances Wang had approved for shipment in January 2023 were controlled or regulated by the United States federal drug laws.

The cases that Wang cites do not support his evidentiary challenge. (*See* Wang Mot. at 2). In *United States v. Dambelly*, 714 F. App'x 87, 89–90 (2d Cir. 2018), the Second Circuit explained that "[t]o convict a defendant of aiding and abetting, a jury must find that the defendant had the specific intent to commit the underlying substantive offense; mere knowledge is not enough." But a reasonable juror could find that Wang was not only knowledgeable about Yang's shipment of methylamine, but affirmatively approved the order after Yang applied to him for "shipment" and "delivery." (GX 401 at 15–16; Tr. 169–70). The facts of this case also stand in stark contrast to *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004), in which the Second Circuit found "no direct evidence" and "far too attenuated" circumstantial evidence that a defendant accused of aiding and abetting had the "specific intent of facilitating or advancing the principal's commission of the underlying crime." Here, there is both direct evidence (in the form of Yang's statements to CS Jose) that Wang approved the January 2023 shipment of methylamine, and circumstantial evidence (in the form of Wang's statements in Bangkok) that Wang knew the substances in the January 2023 shipment were controlled or regulated by the United States federal drug laws.

Because a reasonable jury could and did find Wang participated in the January 2023 shipment of methylamine with the requisite knowledge of its legal status, Wang's motion for acquittal on Count Four should be denied.

### B.    The Evidence Supports Chen's Convictions for Conspiring to Import 1-Boc-4-AP and Conspiring to Commit Money Laundering

Chen moves for acquittal, or in the alternative for a new trial, on Count Two (conspiracy to import 1-boc-4-AP) and Count Five (conspiracy to commit money laundering). With respect to Count Two, Chen argues that "no rational trier of fact could find that the Government proved beyond a reasonable doubt that the object of the conspiracy was to distribute 1-boc-4-AP while intending, knowing, or having reasonable cause to believe that the chemical would be unlawfully

20

imported into the United States." (Chen Mot. at 3). With respect to Count Five, Chen argues that "no rational trier of fact could find that Ms. Chen intended to promote the carrying on of a specified unlawful activity when she agreed to act as a translator between Mr. Wang and the CSs." (Chen Mot. at 3). Chen's arguments boil down to a simple request that the Court credit her own self-serving testimony over all the other evidence in the case. (*See, e.g.*, Chen Mot. at 11 ("Ms. Chen's inferences carry more weight because she testified as to her knowledge of fentanyl in general and her knowledge of fentanyl relative to this transaction."), 13–14 (reciting Chen's testimony)). But "the credibility of witnesses is the province of the jury, and [the court] simply cannot replace the jury's credibility determinations with [its] own." *James*, 239 F.3d at 124.

Contrary to Chen's blanket assertion to the contrary, the jury received ample proof of the object of the 1-boc-4-AP conspiracy. This evidence included:

- The January 2023 shipment of 1-boc-4-AP to New York, which was organized by Yang and approved by Wang. (GX 401 at 11, 13, 15–16; GX 1004; Tr. 168–70, 324).

- The messages that Yang forwarded to Chen in advance of the March 2023 Bangkok meeting, which included the CAS numbers of the January 2023 shipment and CS Jose's statement that "[w]e make some ice and fentanyl," which would be "tested whit [sic] some clients in NY and LA." (GX 807-T at 15, 20–21; Tr. 1073–74).

- The Amarvel Biotech webpages, registered and operated by Chen, advertising the sale of 1-boc-4-AP by chemical name and CAS number, along with its potential use in making fentanyl.[6] (GX 204, 208, 212, 215, 218; Tr. 941–42, 954, 961–62, 965–66, 975–77).

---

[6] In arguing for a new trial, Chen declares that the "website evidence . . . is essentially irrelevant" because it is "unconnected to [Yang] and Wang." (Wang Mot. at 13). In fact, Yang sent CS Jose a link to Amarvel Biotech's primary website, amarvelbio.com, (GX 401 at 33; Tr. 192), and told Chen that she had done so, (GX 852A-T at 1, 3; Tr. 1066–67). In a private chat, Wang asked Chen "[s]till can't push ads on the official website?," to which Chen replied, "[a]ppeal in progress." (GX 808B-T). Yang and Wang thus demonstrated that they were not only aware of the Amarvel Biotech website — which advertised 1-boc-4-AP — but also understood that Chen was responsible for the website. In any event, regardless of whether the Amarvel Biotech websites were "[]connected to [Yang] and Wang," Chen's registration and operation of those websites

(*continued on next page*)

- The group chat with Wang, Chen, Yang, CS Jose, and CS Gil, in which CS Gil ordered 1-boc-4-AP by CAS number and Yang explained the issues with keeping that chemical in stock.  (GX 402 at 8, 11–12; Tr. 234–41, 567–69).

- The April 12, 2023 invoice, circulated by Yang to the group chat with Chen, Wang, CS Jose, and CS Gil, which listed 1-boc-4-AP by chemical name and CAS number and specified delivery to a "[w]arehouse in USA near NY."  (GX 402 at 10; Tr. 237–38, 568–71).

- The May 9, 2023 video call with CS Gil, Wang, Chen, and Xia, during which CS Gil requested 15 times the quantity of each chemical in the May 2023 order, and Chen held up a piece of paper with the first five digits of the CAS number of 1-boc-4-AP.  (GX 504A; GX 504A-T, Tr. 579–82).

This proof disposes of Chen's assertion that "[t]he Government presented no evidence that Ms. Chen affirmatively knew that 1-boc-4-AP was a chemical that they hoped to purchase from Hubei Amarvel."  (Chen Mot. at 11).

Chen also asserts that the "[t]he Government presented no evidence that Ms. Chen intended, knew, or had reasonable cause to believe that 1-boc-4-AP would be unlawfully imported into the United States" because no one explicitly told Chen that CS Jose and CS Gil were "members of a Mexican Drug Cartel" or were "not licensed to manufacture fentanyl in the United States."  (Chen Mot. at 10).  In fact, CS Gil told Chen at the meeting in Bangkok that he was setting up labs in the United States because "sometimes I lose product" while moving fentanyl from Mexico to the United States "because of the legality behind it."  (GX 502D-T; Tr. 476).  Chen demonstrated her understanding by then telling Wang, in Mandarin:  "[H]e used to produce in Mexico, and then ship it to the United States for sale.  However, when crossing the border, it would be seized . . . ."  (GX 502D-T).  Chen was thus well-aware that her customers were illegally moving

---

demonstrates her own knowledge of 1-boc-4-AP, the use of that chemical to make fentanyl, and the conspirators' use of false and concealed packaging to avoid detection by U.S. customs and law enforcement.

fentanyl from Mexico to the United States, were losing product due to seizures at the border, and were even inadvertently killing their customers due to the potency of the fentanyl made from Amarvel Biotech's precursor chemicals, (GX 502C-T; Tr. 415–16).  A reasonable juror could easily infer from this evidence that Chen knew the 1-boc-4-AP requested by CS Gil and CS Jose would be unlawfully imported into the United States, particularly when taken in combination with Wang and Chen's statements in Bangkok describing their ability to evade U.S. customs 99% or more of the time, (GX 502D-T; GX 502M-T; Tr. 500), and Chen's inquiry in Fiji whether CS Gil could assist if their shipments to "America" were "blocked by the police," (GX 505C-T; Tr. 606).

Chen finally asserts that no one told her that by "merely acting as a translator in the meetings and conversations, she was violating the narcotics laws of the United States." (Chen Mot. at 10–11).  Chen's assertion misses the mark for at least three reasons.  First, a reasonable juror viewing the recordings could conclude that Chen was not "merely acting as a translator" but was a full and willing participant in the charged conspiracies, particularly given her role in marketing Amarvel Biotech's chemicals online.  Second, there is no requirement that Chen know that she was violating the narcotics laws of the United States.  *See McFadden*, 576 U.S. at 192 ("ignorance of the law is typically no defense to criminal prosecution").  It is sufficient for Count Two if Chen knew either (1) "the chemical at issue was 1-boc-4-AP," or (2) "the chemical at issue was controlled or regulated by United States federal drug laws." (Tr. 1510).  A reasonable juror could find that Chen met this knowledge requirement in both ways, given her awareness that CS Gil and CS Jose were ordering 1-boc-4-AP and her efforts to avoid detection by U.S. customs and law enforcement, as set forth above.  Third, even if there were a requirement that Chen knew she was violating the narcotics laws of the United States, the jury could infer that she had precisely

23

that knowledge given her review of the Voice of America articles and her concern, expressed to CS Gil in Fiji, that their shipments to the United States would be seized by the police.

Chen says that her arguments as to Count Two apply equally to Count Five because there is insufficient proof she "intended to promote the carrying on of a specified unlawful activity when she agreed to act as a translator between Mr. Wang and the CSs."  (Chen Mot. at 12–13).  These arguments fail for the same reasons set forth above.  Chen's only new argument in the context of Count Five is that her conduct is "inconsistent with a person looking to conceal an illegal narcotics transaction" because "the funds were transferred in a traceable medium (crypto), and the client received a payment receipt."  (Chen Mot. at 13).  While Chen was free to argue this inference to the jury — as Wang did, (*see* Tr. 1390 ("[p]eople that are engaged in the drug business knowingly don't do invoices")) — the jury was also free to reject it.  A reasonable juror could instead conclude that Chen conspired with Wang and Yang to receive payment in cryptocurrency because, as Yang put it, "most of our customers use Bitcoin and Western Union for payment and are always safe" from "payment issues being traced."  (GX 401 at 9; Tr. 163–64).

Because a reasonable jury could and did find that Chen conspired to unlawfully import 1-boc-4-AP into the United States and to launder money, and because there is no manifest injustice in allowing that verdict to stand, Chen's motions for acquittal or for a new trial on Counts Two and Five should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Wang and Chen's motions for acquittal and for a new trial should be denied.

Dated: New York, New York
February 20, 2025

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York

By: _____
Alexander Li
Kevin Sullivan
Assistant United States Attorney
(212) 637-2265 / -1587