UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>QINGZHOU WANG,<br>     a/k/a "Bruce," and<br>YIYI CHEN,<br>     a/k/a "Chiron,"<br><br>                    Defendants. | S1 23 Cr. 302 (PGG) |

**THE GOVERNMENT'S SENTENCING MEMORANDUM FOR DEFENDANTS
QINGZHOU WANG AND YIYI CHEN**

                                        JAY CLAYTON
                                        United States Attorney
                                        Southern District of New York
                                        26 Federal Plaza, 37th Floor
                                        New York, New York 10278

Alexander Li
Kevin Sullivan
Assistant United States Attorneys
     *Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..................................................................................................... 2

    I.    Wang and Chen's Offense Conduct............................................................. 2

          A.    Overview.................................................................................... 2

          B.    Wang, Chen, and Yang's Roles in the Conspiracy ......................... 3

          C.    April-May 2022: Chen Creates Amarvel Biotech Websites Advertising Fentanyl and Concealed Packaging ............................... 5

          D.    November 2022–January 2023: Wang and Yang Ship Fentanyl and Methamphetamine Precursors to New York....................................... 6

          E.    March 2023: Wang and Chen Meet with CS Gil in Bangkok ......................... 7

          F.    April-May 2023: Wang, Chen, and Yang Ship Fentanyl-Related Precursors to California ............................................................... 10

          G.    June 2023: Wang and Chen Meet with CS Gil in Fiji ................................. 14

    II.    Procedural History ................................................................................ 16

    III.    Forfeiture............................................................................................. 18

GUIDELINES CALCULATION ........................................................................... 18

    I.    Wang's Guidelines Objections .............................................................. 19

          A.    The Sophisticated Laundering Enhancement.................................. 20

          B.    The Leadership Enhancement....................................................... 23

          C.    The Mass Marketing Enhancement .............................................. 26

    II.    Chen's Guidelines Objections................................................................ 28

THE APPROPRIATE SENTENCE ....................................................................... 34

    I.    The Court Should Sentence Wang to at Least 240 Months' Imprisonment, and Chen to at Least 216 Months' Imprisonment ............................................. 36

          A.    The Seriousness of the Offense and the Need for Just Punishment................ 36

          B.    Deterrence and Incapacitation....................................................... 38

        C.      Wang's Leadership Role ................................................................... 40

        D.      Chen's Perjury at Trial ..................................................................... 41

    II.     Wang's Arguments for Leniency .................................................................. 41

    III.    Chen's Arguments for Leniency ................................................................... 42

CONCLUSION ................................................................................................................. 46

The United States is in a life-and-death struggle with fentanyl.  Every day, staggering numbers of men and women around the country die from a synthetic drug of extraordinary potency. Defendants Qingzhou Wang, a/k/a "Bruce" ("Wang"), and Yiyi Chen, a/k/a "Chiron" ("Chen"), fed on and profited from that crisis.  Until their arrests in June 2023, they ran a Chinese chemical business that exported massive quantities of precursor chemicals — the ingredients to manufacture fentanyl, fentanyl analogues, and other deadly drugs — to customers around the world, including in the United States.  They created online storefronts to sell precursors, openly advertising that the chemicals could be used to make fentanyl.  They promised "100% stealth shipping" across national borders using fake packaging, like dog food or nuts.   And when the Drug Enforcement Administration ("DEA") placed undercover orders, they delivered.  In a single shipment, Wang and Chen sent more than 200 kilograms of fentanyl-related precursors from China to California — a quantity they believed would be used to make at least 50 kilograms of fentanyl, equivalent to 25 million deadly doses.

Earlier this year, Wang and Chen stood trial in this Court, where twelve jurors heard the evidence and unanimously convicted them of chemical importation and money laundering offenses.  Now Wang and Chen await sentencing.  The Government agrees with the United States Probation Office ("Probation" or "Probation Office") that Wang's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 292 to 365 months' imprisonment, and, owing to her perjury at trial, Chen's Guidelines range is even higher, 324 to 405 months' imprisonment.  For the reasons set forth below, Wang should receive a sentence of at least 240 months' imprisonment, and Chen should receive a sentence of at least 216 months' imprisonment.

## BACKGROUND

I.    **Wang and Chen's Offense Conduct**

A.    **Overview**

The manufacture of synthetic drugs, such as fentanyl and methamphetamine, begins with raw chemicals, known as precursors. Defendant Hubei Amarvel Biotech Co., Ltd., a/k/a "AmarvelBio" ("Amarvel Biotech"), was a large-scale manufacturer and supplier of drug precursors based in Wuhan, China. Using a constellation of storefront websites, Amarvel Biotech and its sister company, Wuhan Wingroup Pharmaceutical Co. Ltd. ("Wingroup Pharmaceutical"), openly advertised the sale and international shipment of a variety of precursor chemicals, including chemicals used to manufacture fentanyl, methamphetamine, MDMA, and gamma-hydroxybutyric acid ("GHB"), which is popularly referred to as a "date rape drug." Amarvel Biotech boasted of its ton-quantity monthly shipments to the United States, and it specifically targeted precursor chemical customers in Mexico, including by advertising fentanyl precursors as a "Mexico hot sale," guaranteeing "100% stealth shipping" abroad, and boasting on its websites shipments to Culiacan, Mexico — the geographic base of the Sinaloa Cartel, which was, at relevant times, a primary distributor of fentanyl to the United States.[1] Amarvel Biotech also advertised online its ability to use fake and concealed packaging, such as by labeling its containers as dog food, nuts, or motor oil, to ensure "safe" delivery to the United States and Mexico.

---

[1] *See* U.S. Drug Enforcement Administration, *National Drug Threat Assessment 2024* at 6, https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf ("The Sinaloa Cartel dominates the fentanyl market through its manipulation of the global supply chain and the proliferation of clandestine fentanyl labs in Mexico , . . . Los Chapitos initially established a base of operations for manufacturing illicit fentanyl in the mountains near Culiacan. Now, they control the procurement of precursor chemicals, largely from China, and direct the production of illicit fentanyl from labs hidden in the mountains of Sinaloa and in other Sinaloa Cartel strongholds throughout Mexico.").

Defendants Wang, Chen, and FNU LNU, a/k/a "Er Yang," a/k/a "Anita" ("Yang") were executives and employees of Amarvel Biotech.  Beginning in November 2022, Wang and Yang negotiated, sold, and shipped approximately one kilogram each of the fentanyl precursors 1-boc-4-AP and 1-boc-4-piperidone, and approximately 894 grams of the methamphetamine precursor methylamine, to a DEA confidential source ("CS Jose")[2] posing as a Mexican drug trafficker who was based in New York.  Wang, Chen, and Yang planned to ship even larger quantities of fentanyl precursors from China to the United States, even though they had been told that Americans had already died after consuming fentanyl produced from the sample chemicals.  For example, in May 2023, Wang, Chen, and Yang delivered to California more than 200 kilograms of fentanyl-related precursors, which, unbeknownst to the defendants was in fact retrieved by the DEA.  The fentanyl-related precursors could have been used to manufacture a fentanyl analogue called ortho-methylfentanyl.  Wang, Chen, and Yang requested and accepted payment in cryptocurrency, most of which was delivered to cryptocurrency wallets held by Wang and his wife.

### B.    Wang, Chen, and Yang's Roles in the Conspiracy

Wang and Chen held key roles within the conspiracy.

Wang was the "boss" of the conspiracy, as Chen, Yang, and Wang himself acknowledged. (Tr. 168, 396, 1082; *see also* GX 401 at 42 (Yang: "This is the telephone number of my boss, Mr. Wang"); GX 502C-T at 3 (Chen: "My boss said, of course, we will be pleasure to help you for this technology."); GX 806-T at 54 (Wang: "Director Wang has the final say over here."); Wang PSR ¶¶ 17, 23, 29; Chen PSR ¶¶ 19, 25, 31).[3]  Evidence at trial established that Amarvel Biotech

---

[2] CS Jose testified at trial under the pseudonym "Antonio Garcia."  (Tr. 141, 146).

[3] "Wang PSR" and "Chen PSR" refer to the Presentence Reports prepared by Probation in connection with the sentencing of Wang and Chen, respectively.

and its sister companies employed more than a dozen people, including marketing specialists like Chen and sales representatives like Yang. (*See* Tr. 1131–33 (discussing dinner party with company employees); DX A14 and A15 (each depicting approximately 17 individuals at the dinner party)). On its primary website, Amarvel Biotech boasted that, in one year alone, it had shipped orders to 278 customers in 63 countries, with seven of its products having sold more than a metric ton each. (GX 206).

Chen was the marketing manager of the conspiracy, as she told a second DEA confidential source ("CS Gil")[4] at a meeting in Bangkok, Thailand on March 23, 2023. (Tr. 413; GX 502B-T (Chen: "I'm taking care of marketing."); *see also* GX 741 and 742 (business cards identifying Chen as "Sales Manager" for Amarvel Biotech's sister company, Wingroup Pharmaceutical); GX 301A–G (domain name registration records identifying Chen as registrant of website domains operated by Amarvel Biotech and Wuhan Pharmaceutical); Wang PSR ¶¶ 18, 44; Chen PSR ¶¶ 20, 46). Chen also had at least one subordinate. (Wang PSR ¶ 44; Chen PSR ¶ 46). Chen testified at trial that she hired an employee "specifically to work on advertisement on Google," (Tr. 1130), referring to Google's suspension of Amarvel Biotech's online advertisements for "words violating the [Google] policy," (Tr. 1149). One of the words that Amarvel Biotech used that violated Google's policy was "fentanyl." (Tr. 1181; *see also* GX 810–813 (emails from Google); Wang PSR ¶¶ 18, 44; Chen ¶¶ 20, 46). As set forth below, the websites that Chen created specifically advertised the manufacture of fentanyl, the deadly drug responsible for the overdose and poisoning deaths of tens of thousands of Americans.

Yang was the sales representative for the conspiracy who negotiated the precursor chemical transactions with CS Jose during the DEA undercover operation. (Tr. 147; *see also* GX 401 (chat

---

[4] CS Gil testified at trial under the pseudonym "Jorge Rodriguez." (Tr. 387, 395).

messages between Yang and CS Jose); Wang PSR ¶ 19; Chen PSR ¶ 21). Yang was one of at least seven sales representatives at Amarvel Biotech. (*See* GX 206 (official Amarvel Biotech website displaying contact information for approximately seven sales representatives); Wang PSR ¶ 19; Chen PSR ¶ 21). Chen maintained a group chat with approximately six sales representatives in which Chen circulated screenshots of customer inquiries, including requests for various drug precursors, for follow-up by the sales representatives. (Dkt. 114 (discussing proposed GX 809 series of chats, which the Government ultimately did not offer at trial); *see also* Dkt. 117 (defense response to the chats); Wang PSR ¶ 18; Chen PSR ¶ 20).

### C.    April-May 2022: Chen Creates Amarvel Biotech Websites Advertising Fentanyl and Concealed Packaging

In April and May 2022, Chen registered six web domains operated by Amarvel Biotech. (GX 301A–F; *see also* Tr. 935–36, 950–51, 957–58, 963–64, 967, 971, 978, 1212–13, 1217–18, 1220–24). Each of these websites listed for sale the fentanyl precursors 1-boc-4-AP and 1-boc-4-piperidone. (GX 203, 204, 205, 207, 208, 211, 212, 214, 215, 217, 218, 219, 220; *see also* Tr. 939–45, 951–53, 960–62, 964–66, 972–82). Several of Chen's websites, including Amarvel Biotech's principal website "amarvelbio.com," also featured methylamine. (GX 202, 209, 213; *see also* Tr. 936–37, 955–56, 962–63). Most of the product listing webpages for 1-boc-4-AP explicitly advertised that chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives," (GX 208, 212, 215, 218; *see also* Tr. 954, 961–62, 965–66, 975–77), with one webpage simply replacing the "Fentanyl" with "F," (GX 204 ("intermediate in the preparation of F derivatives"); *see also* Tr. 941–42; Wang PSR ¶ 16; Chen PSR ¶ 18).

Chen's websites also advertised Amarvel Biotech's ability to ship chemicals using false or concealed packaging, including a promotional video on Amarvel Biotech's principal website depicting various forms of fake packaging including engine oil, dog feed, beeswax, and nuts. (GX

206A; *see also* GX 208, 209, 210, 211, 212, 217, 218, 219, 220; Tr. 945–48, 953–56, 958–62, 972–83; Wang PSR ¶ 16; Chen PSR ¶ 18).  Images, video, and text — including a text file describing 1-boc-4-AP as an "[i]ntermediate in the preparation of Fentanyl derivatives" — matching those published on the websites were also found on Chen's laptop, thus cementing her knowledge, and indeed authorship, of the incriminating content published online.  (*See, e.g.*, GX 711 (image of "Nature's Nuts" packaging); GX 719 (photo of 1-boc-4-piperidone powder); GX 714 (video of 1-boc-4-piperidone powder); GX 745 (text of 1-boc-4-AP product listing); *see also* Tr. 1000–04, 1012–13; Chen PSR ¶ 48).

**D.    November 2022–January 2023:    Wang and Yang Ship Fentanyl and Methamphetamine Precursors to New York**

In November 2022, CS Jose contacted Amarvel Biotech by WhatsApp as part of a DEA undercover operation.  (Tr. 148–49; Wang PSR ¶ 20; Chen PSR ¶ 22).  Yang responded on behalf of the company, and she agreed to sell an initial sample of one kilogram each of 1-boc-4-AP, 1-boc-4-piperidone, and methylamine to CS Jose in Manhattan.  (GX 401 at 11; Tr. 148–49, 165–67; Wang PSR ¶ 20; Chen PSR ¶ 22).  CS Jose explicitly told Yang that his organization was making fentanyl, (GX 401 at 5, 9, 20; Tr. 160, 163, 174), and Yang assured CS Jose that he did not need to "worry about payment issues being traced, as most of our customers use Bitcoin and Western Union for payment and are always safe," (GX 401 at 9; Tr. 163–64; Wang PSR ¶ 21; Chen PSR ¶ 23).  Yang proposed that CS Jose pay with cryptocurrency from New York.  (GX 401 at 10; Tr. 164; Wang PSR ¶ 21; Chen PSR ¶ 23).  After confirming receipt of the payment in the cryptocurrency USDT, (GX 401 at 16; Tr. 169–70), Yang provided CS Jose with regular updates on the shipment of the chemicals, including customs clearance and a photo of a FedEx shipping label, (GX 401 at 22–25; Tr. 175–79; Wang PSR ¶ 21; Chen PSR ¶ 23).  On January 18, 2023, the DEA retrieved a package bearing that same FedEx label from a FedEx facility in Brooklyn, New

York.  (GX 1004; Tr. 309–10; Wang PSR ¶ 22; Chen PSR ¶ 24).  A DEA forensic chemist examined the contents of the package and found it contained approximately one kilogram of 1-boc-4-AP, approximately one kilogram of 1-boc-4-piperidone, and approximately 894 grams of methylamine.  (Tr. 322, 324, 327; Wang PSR ¶ 22; Chen PSR ¶ 24).

During their discussions of the sample purchase, Yang repeatedly referenced the involvement of her "boss" in approving the pricing and shipment of the chemicals, as well as in confirming receipt of the cryptocurrency.  (GX 401 at 13, 15–16; Tr. 168–70; Wang PSR ¶ 23; Chen PSR ¶ 25).  Yang later identified her "boss" as "Bruce Wang."  (GX 401 at 43; Tr. 168, 214).  After the January 2023 shipment, Yang agreed to arrange a meeting in Bangkok with her "boss" Wang and her "colleague" Chen to discuss the long-term supply of chemicals to CS Jose's organization, (GX 401 at 42–43; *see* Wang PSR ¶ 24; Chen PSR ¶ 26), but advised that her "boss" first wanted $5,000 as an advance payment towards the next order, (GX 401 at 35; Tr. 194; Wang PSR ¶ 24; Chen PSR ¶ 26).  Yang proposed that CS Jose again "pay with USDT in US."  (GX 401 at 36; Tr. 195; Wang PSR ¶ 24; Chen PSR ¶ 26).  CS Jose agreed to the payment, Yang acknowledged that her "boss" received $4,972 in USDT, and cryptocurrency exchange records confirmed the recipient of the payment was Wang in China.  (GX 401 at 39; GX 304-T; Tr. 194, 197–98; Wang PSR ¶ 24; Chen PSR ¶ 26).

### E.    March 2023:  Wang and Chen Meet with CS Gil in Bangkok

On March 23, 2023, Wang and Chen met in Bangkok with CS Gil, who was posing as CS Jose's boss in a Mexican drug cartel.  (Tr. 389, 406–07; Wang PSR ¶ 25; Chen PSR ¶ 27).  Before the meeting, Wang created a private group chat with Chen and Yang.  (GX 806-T; Tr. 1067–78; Wang PSR ¶ 26; Chen PSR ¶ 28).  In the private group chat, Yang informed Wang and Chen that she had been communicating with a "Mexican client" named "Jose."  (GX 806-T at 2, 12; Tr. 1068–69; Wang PSR ¶ 26; Chen PSR ¶ 28).  At Chen's request, (GX 806-T at 14; Tr. 1069), Yang

forwarded to Chen her prior WhatsApp chats with CS Jose, (GX 807-T; Tr. 1069–72; Wang PSR ¶ 26; Chen PSR ¶ 28). These forwarded messages included the specific Chemical Abstracts Service ("CAS") numbers and pricing of the three chemicals in the sample shipment (*i.e.*, 1-boc-4-AP, 1-boc-4-piperidone, and methylamine), as well as CS Jose's statement that "[w]e make some ice [*i.e.*, methamphetamine] and fentanyl," which would be "tested whit [sic] some clients in NY and LA." (GX 807-T at 15, 20–21; Tr. 1073–74; *see also* Wang PSR ¶ 26; Chen PSR ¶ 28).

During the meeting in Bangkok, which was recorded, CS Gil explicitly told Wang and Chen that he planned to open a laboratory in New York to make fentanyl. (GX 502B-T; Tr. 412–13; Wang PSR ¶ 27; Chen PSR ¶ 29). Translating from English into Mandarin, Chen told Wang that "he wants to open a chemical laboratory in New York" and to "use this product to make fentanyl." (GX 502B-T). CS Gil told Wang and Chen that the fentanyl he made from Amarvel Biotech's prior shipment was "too strong" and that "several Americans" had died as a result. (GX 502C-T; Tr. 415–16, 469; Wang PSR ¶ 27; Chen PSR ¶ 29). CS Gil asked for assistance with improving his formula for fentanyl. (GX 502C-T, Tr. 469; Wang PSR ¶ 27; Chen PSR ¶ 29). After Chen translated CS Gil's statements, Wang responded in Mandarin that "we have many clients in Mexico and the United States" who "know the method," and that the company also had its own ability to find "professional technical guidance." (GX 502C-T; *see also* Wang PSR ¶ 27; Chen PSR ¶ 29). Wang assured CS Gil that "after we start working together, I will use my capacity to help you." (GX 502C-T; *see also* Wang PSR ¶ 27; Chen PSR ¶ 29). Wang and Chen then privately discussed, in Mandarin, the possibility of sharing the formula for fentanyl using an application that would cause the message to "disappear in a few days." (GX 502C-T; *see also* Wang PSR ¶ 27; Chen PSR ¶ 29).

Wang and Chen also described their success in smuggling large quantities of chemicals into the United States without detection. (Wang PSR ¶ 29; Chen PSR ¶ 31) For example, CS Gil explained that he was setting up labs in the United States because "sometimes I lose product" while moving fentanyl from Mexico to the United States "because of the legality behind it." (GX 502D-T; Tr. 476; Wang PSR ¶ 29; Chen PSR ¶ 31). Translating into Mandarin, Chen told Wang: "[H]e used to produce in Mexico, and then ship it to the United States for sale. However, when crossing the border, it would be seized . . . ." (GX 502D-T). In response, Wang told Chen that CS Gil's idea of setting up a fentanyl laboratory in the United States was "very correct" because "in America, our logistics are fastest." (GX 502D-T; Wang PSR ¶ 29; Chen PSR ¶ 31). Wang explained that "regarding the customs risk in the U.S., about 99% can be cleared," (GX 502D-T), and that "perhaps 1 out of 1000 orders might be detained," (GX 502M-T; *see also* Wang PSR ¶ 29; Chen PSR ¶ 31). Wang added that "[i]f there are items failed to pass through customs, we may still bring the goods out through some other methods." (GX 502D-T). Chen told CS Gil that "[a]s far this month . . . we ship already 7 tons to America," and that CS Gil could "add 3 tons or 5 tons, it's not a problem because to America it's quite safe." (GX 502M-T; Tr. 499–500).

At one point during the March 2023 meeting in Bangkok, Chen explained that Amarvel Biotech had two bosses, Wang and "another one" in Japan. (GX 502I-T; Tr. 488–89). When CS Gil asked to meet the other boss, Wang placed a video call to Fengzhi Xia in the presence of CS Gil. (Tr. 489–90). During the video call, Wang told Xia, in Mandarin: "[T]he client . . . said to meet another boss, the boss in Japan. And then [I told him] I'm, I'm the boss in charge of this piece of business." (GX 502I-T; *see also* Wang PSR ¶ 29; Chen PSR ¶ 31). At the end of the meeting in Bangkok, Chen told CS Gil that Yang would "communicate with you" regarding CS Gil's upcoming order of precursor chemicals. (GX 502Q-T; Tr. 536–37). When CS Gil suggested

Yang write in code, such as by using "F for fentanyl," Chen replied, "maybe she will not write the name of the product."  (GX 502Q-T).

F.    **April-May 2023:  Wang, Chen, and Yang Ship Fentanyl-Related Precursors to California**

After the March 23, 2023 meeting in Bangkok, Chen created a group chat with Wang, Yang, CS Jose, CS Gil, and later Xia.  (GX 402; Tr. 539–40; Wang PSR ¶ 28; Chen PSR ¶ 30). CS Gil asked in the group chat for the products that "would be [b]est to produce . . . [b]est fentanyl."  (GX 402 at 2; Tr. 541–42; Wang PSR ¶ 28; Chen PSR ¶ 30).  Consistent with Chen's directive in Bangkok, however, the conspirators attempted to keep the group chat clear of explicit drug talk, instead reserving that task for Yang in direct communications with CS Jose.  For example, on March 28, 2023, Yang sent a chart to CS Jose listing certain fentanyl precursor chemicals — specifically, 1-boc-4-AP and 1-boc-4-piperidone — with their corresponding application as "[f]entanyl," and simultaneously sent an identical chart to the group chat with the "[f]entanyl" column removed.  (*Compare* GX 401 at 46 *with* GX 402 at 3; *see also* Tr. 223–24). Yang explained in the group chat that "[i]n the table are our best-selling staple products" and "I will confirm the other details with Jose in private."  (GX 402 at 4; Tr. 224–25).  Similarly, on March 30, 2023, after Gil asked in the group chat to "[b]uy everything from you . . . [t]o get final product," Chen replied, "I've described clearly your requires [sic] and our meeting conversations to [Yang], she will handle it," followed by a winking emoji.  (GX 402 at 6; Tr. 552–53).

On April 10, 2023, Wang and Chen, along with Xia, participated in a recorded video call with CS Gil regarding a purchase of precursor chemicals.  (Tr. 554, 1227; Wang PSR ¶ 30; Chen PSR ¶ 32).  CS Gil explained that he wanted to receive the next order of chemicals in New York to make "50-55 kilos of the final product," and Chen replied by inquiring whether "your New York lab . . . is under construction?"  (GX 503A-T; Tr. 556–57; *see also* Wang PSR ¶ 30; Chen PSR

¶ 32). Chen then told Wang, in Mandarin, that CS Gil "wants to produce the final product weighing 50-55 kilograms and will provide us with a form specifying the raw materials he wants." (GX 503A-T). Wang replied, in Mandarin, "No problem." (GX 503A-T; Wang PSR ¶ 30; Chen PSR ¶ 32).

After discussing with Wang and Chen on the video call purchasing enough precursor chemicals to produce 50 to 55 kilograms of fentanyl, the next day, on April 11, 2023, CS Gil placed in the group chat an order for three fentanyl precursors: 50 kilograms of 1-boc-4-AP, 100 kilograms of propionyl chloride, and 60 kilograms of 2-(bromoethyl)benzene. (GX 402 at 8; Tr. 234–35, 567–68; Wang PSR ¶ 31; Chen PSR ¶ 33). As DEA chemist Dr. Christine Herdman explained at trial, these three chemicals can be used together to synthesize fentanyl. (Tr. 811–12). Yang responded the following day in the group chat with an invoice on Amarvel Biotech letterhead listing each chemical by name, CAS number, and quantity. (GX 402 at 10; Tr. 237–38, 568–69; Wang PSR ¶ 31; Chen PSR ¶ 33). The invoice provided for delivery to a "[w]arehouse in USA near NY" and indicated a total price of $45,800, payable in USDT (among other payment methods), less the approximately $4,972 paid prior to the Bangkok meeting. (GX 402 at 10; Tr. 237–38, 571; Wang PSR ¶ 31; Chen PSR ¶ 33). On April 14, 2023, Yang confirmed receipt of the remaining balance. (GX 402 at 12; Wang PSR ¶ 32; Chen PSR ¶ 34). Cryptocurrency exchange records indicate that the recipient of the transfer was again Wang in China. (GX 304-T; Tr. 242–43; Wang PSR ¶ 32; Chen PSR ¶ 34).

After confirming the order, Yang informed CS Jose that one of the fentanyl precursors — 1-boc-4-AP — was "very special" and required additional "production time" — *i.e.*, that it was out of stock. (GX 401 at 58–59; Tr. 240; Wang PSR ¶ 32; Chen PSR ¶ 34). Yang proposed instead sending 1-boc-4-piperidone and even offered to "provide the method of making ANPP" with that

precursor.  (GX 401 at 59; Tr. 241; Wang PSR ¶ 32; Chen PSR ¶ 34).  As Dr. Herdman explained, ANPP is an immediate precursor to fentanyl — meaning it is only a single chemical reaction away from fentanyl — and ANPP can indeed be synthesized from 1-boc-4-piperidone.  (Tr. 802–03, 807, 816–17; *see also* Wang PSR ¶ 32; Chen PSR ¶ 34).  After CS Jose expressed frustration, (GX 401 at 58; Tr. 239–40), Yang advised that the 1-boc-4-AP was back in stock and available to ship after all, (GX 401 at 60; GX 402 at 11–12; Tr. 241).

On April 28, 2023, Yang notified CS Jose that the 210-kilogram fentanyl precursor shipment had arrived at a warehouse near Los Angeles, California.  (GX 401 at 61–62; Tr. 244; Wang PSR ¶ 33; Chen PSR ¶ 35).  In the group chat, Yang explained that "New York, the United States, has been strict in checking the precursors of the 'final product' some time ago, so for the sake of safety, this time it is sent to California."  (GX 402 at 18; Tr. 246–47, 572; *see also* Wang PSR ¶ 33; Chen PSR ¶ 35).  CS Jose testified that he understood Yang to be "saying basically they are afraid that the customs in New York would seize the merchandise."  (Tr. 247).  Similarly, CS Gil testified that he understood Yang to mean that "due to the strict checking by the law enforcement in New York . . . this time they were going to send it to California for safety reasons." (Tr. 572–73).

On May 5, 2023, the DEA retrieved the shipment of precursor chemicals from the warehouse in California.  (GX 1006; Tr. 750–51; Wang PSR ¶ 34; Chen PSR ¶ 36).  The eight boxes in the shipment filled the bed of a pickup truck, (GX 106), and several of the boxes bore warning labels falsely depicting batteries, (GX 4A, 4C, 107, 125; Tr. 753, 756, 768; Wang PSR ¶ 34; Chen PSR ¶ 36).  Photographs of the boxes and some of their contents are shown below:







(GX 106, 111, 110).

A DEA forensic chemist tested the contents of the shipment and determined that it contained approximately 105 kilograms of propionyl chloride, approximately 68 kilograms of 2-(bromoethyl)benzene, and approximately 50 kilograms of ortho-methyl-N-boc-4-AP.  (Tr. 771, 776–78; Wang PSR ¶ 34; Chen PSR ¶ 36; *see also* Tr. 809, 819 (alternate chemical names)).  Dr. Herdman testified that ortho-methyl-N-boc-4-AP is substantially similar in chemical structure to 1-boc-4-AP, differing only by the substitution of a single hydrogen atom in 1-boc-4-AP with a methyl group.  (Tr. 820).  Dr. Herdman further explained that ortho-methyl-N-boc-4-AP can be used in the same manner as 1-boc-4-AP to synthesize a substance called ortho-methylfentanyl, which — like its precursor ortho-methyl-N-boc-4-AP — differs from fentanyl only by the substitution of a single hydrogen atom in fentanyl with a methyl group.  (Tr. 821–22).  As defense chemist Heather Harris conceded, ortho-methylfentanyl is a fentanyl analogue and a fentanyl-related substance.  (Tr. 1104, 1106; Wang PSR ¶ 34; Chen PSR ¶ 36).

## G.     June 2023:  Wang and Chen Meet with CS Gil in Fiji

After the May 2023 shipment of approximately 210 kilograms of fentanyl-related precursors to the United States, Wang, Chen, and Yang discussed organizing another in-person meeting in Fiji to finalize even larger shipments of fentanyl precursors.  (Tr. 583; Wang PSR ¶ 35; Chen PSR ¶ 37).  In advance of the in-person meeting, Wang and Chen held a recorded video call on May 9, 2023 with CS Gil and another DEA confidential source, who attended the call from Manhattan and posed as CS Gil's investor.  (Tr. 576–77, 587; Wang PSR ¶ 36; Chen PSR ¶ 38).  Xia also joined the video call.  (Tr. 576, 578).  CS Gil explained that he wanted 15 times the quantity of each chemical in the May 2023 order, for a total of more than 3 tons of fentanyl precursors.  (GX 504A-T; Tr. 579–80; Wang PSR ¶ 36; Chen PSR ¶ 38).  Wang stated that the customer should first "pay a deposit" before they would meet in Fiji.  (GX 504A-T; Tr. 582–83; Wang PSR ¶ 36; Chen PSR ¶ 38).  Yang negotiated a deposit of $20,000 in USDT and confirmed

receipt of the funds on May 16, 2023. (GX 402 at 27–28; Wang PSR ¶ 36; Chen PSR ¶ 38). Cryptocurrency exchange records indicate that the recipient of the transfer was "Bing Bing Xia." (DX A; Tr. 667, 673–74, 678–80). Through his sentencing submission and interview with Probation, Wang revealed for the first time that Bing Bing Xia is his wife.[5] (Wang Mem. 5, 11; Wang PSR ¶ 73).[6]

On June 8, 2023, Wang and Chen met with CS Gil in Fiji. (Tr. 430–32; Wang PSR ¶ 37; Chen PSR ¶ 39). During the meeting, which was recorded, Wang and Chen discussed the multi-ton shipment and their newly heightened concerns about detection in the United States. (Wang PSR ¶ 37; Chen PSR ¶ 39) For example, Wang asked Chen, in Mandarin: "If it was inspected by the U.S. Customs, what would happen after that? . . . [I]t could potentially trigger . . . a reexamination . . . like Shuokang." (GX 505A-T; Tr. 1049). Wang was apparently referring to Wuhan Shuokang Biological Technology Co., Ltd. ("Shuokang"), a Chinese company that Chen had previously researched. (GX 253-T; Tr. 1046). Specifically, on April 15, 2023, as reflected in

---

[5] At the trial, Wang argued to the jury that CS Gil should be discredited because he initially testified that the $20,000 payment went to Wang, was confronted with the cryptocurrency records in Defense Exhibit A, and then had to concede that it went to someone else:

> Now, you had fake Gilberto up there on the stand, and fake Gilberto is shown this transaction. The government asks him about it, and then they ask who did that go to? And this man of course will stop at nothing to get people he needs to get in trouble in trouble. So he says that went to Mr. Wang. And we had to present Defense Exhibit A saying this didn't go to Mr. Wang, it went to somebody else. And then and only then when confronted does he say, oh, right, you caught me. That's true.

(Tr. 1401–02). Only now has Wang revealed that the person who received the payment in Defense Exhibit A was his wife.

[6] "Wang Mem." refers to Wang's sentencing submission, (Dkt. 161), and "Chen Mem." refers to Chen's sentencing submission, (Dkt. 159).

her phone's browser history, Chen performed a Google search for "voachina fentanyl." (GX 802; Tr. 1038–39). Chen then viewed three Voice of America articles describing the United States Government's efforts to combat fentanyl trafficking. (GX 802, 251-T, 252-T, 253-T; Tr. 1040–47). One of those articles explained that the United States had sanctioned Shuokang for supplying "Mexican drug cartels with precursors chemicals for the production of illegal fentanyl intended for the U.S. market," and had also indicted three representatives of Shuokang in federal court.[7] (GX 253-T; Tr. 1045–47). Consistent with having read and understood this report, Chen explained to CS Gil at the meeting in Fiji that "recently American government uh seized, some Mexican, Mexican group and uh, they, they follow the route to China" and found "[our] [c]ompetitor in China," which was "bad news for us." (GX 505B-T; *see also* Wang PSR ¶ 37; Chen PSR ¶ 39). Chen asked CS Gil "[i]f our products blocked by the police," whether CS Gil had any way to get the products out. (GX 505C-T; Tr. 605–06).

After the meeting, Fijian law enforcement authorities arrested Wang and Chen and expelled them from the country. (Tr. 433–44, 461; Wang PSR ¶ 40; Chen PSR ¶ 42). DEA agents took custody of Wang and Chen and transported them to Honolulu, Hawaii, where they were presented and then transferred to the Southern District of New York. (Wang PSR ¶ 40; Chen PSR ¶ 42).

## II.    Procedural History

On June 22, 2023, a grand jury returned Indictment 23 Cr. 302, which charged the defendants in five counts. (Dkt. 7). Count One charged Wang, Chen, Yang, and Amarvel Biotech

---

[7] *See* DEP'T OF TREASURY, U.S. Sanctions Suppliers of Precursor Chemicals for Fentanyl Production (April 14, 2023), https://home.treasury.gov/news/press-releases/jy1413 (announcing sanctions against Shuokang, another Chinese entity, and multiple Chinese nationals "for supplying precursor chemicals to drug cartels in Mexico for the production of illicit fentanyl intended for U.S. markets" and reporting that "a federal grand jury in the U.S. District Court for the Southern District of New York (SDNY) indicted" three Shuokang associates "for various conspiracy charges including fentanyl importation and money laundering").

with conspiracy to manufacture, distribute, possess with intent to manufacture, and possess with intent to distribute fentanyl and an analogue of fentanyl, in violation of 21 U.S.C. §§ 846, 813(a), and 841(b)(1)(A).  Count Two charged Wang, Chen, Yang, and Amarvel Biotech with conspiracy to manufacture and distribute 1-boc-4-AP, intending, knowing, and having reasonable cause that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 841(a)(1), 960(d)(1), 960(d)(3), and 21 C.F.R. § 1310.02(a)(39).  Count Three charged Wang, Yang, and Amarvel Biotech (but not Chen) with manufacturing and distributing 1-boc-4-AP, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 841(a)(1), 960(d)(1), and 960(d)(3), 18 U.S.C. § 2, and 21 C.F.R. § 1310.02(a)(39).  Count Four charged Wang, Yang, and Amarvel Biotech (but not Chen) with manufacturing and distributing methylamine, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960(d)(7), 18 U.S.C. § 2, and 21 C.F.R. § 1310.02(a)(14).  And Count Five charged Wang, Chen, Yang, and Amarvel Biotech with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and (a)(2)(A).

On October 3, 2024, a grand jury returned Superseding Indictment S1 23 Cr. 302 (the "Superseding Indictment"), which added "fentanyl-related substance" and a corresponding citation to 21 C.F.R. § 1308.11(h)(30)(i) to Count One.  (Dkt. 79).

On January 13, 2025, trial commenced on the Superseding Indictment.  On January 29, 2025, the jury returned a unanimous verdict of not guilty on Count One and guilty on Counts Two through Five.  (Tr. 1542–46).  As to Counts Two and Three, the jury also found that Wang and Chen (in Count Two) and Wang (in Count Three) knew or had reasonable cause to believe that the 1-boc-4-AP would be used to manufacture fentanyl.  (Tr. 1543–44).

On June 24, 2025, the Court denied Wang and Chen's motions for judgment of acquittal or, in the alternative, for a new trial.  (Dkt. 156).

### III.    Forfeiture

On April 16, 2025, the Government submitted proposed forfeiture orders as to Wang and Chen.  (Dkt. 148).

As to Wang, the proposed forfeiture order includes a money judgment in the amount of $67,168.25, representing the value of the cryptocurrency paid by the DEA for the controlled purchases in this case.  The proposed order of forfeiture also requires Wang to forfeit all right, title, and interest in specific cryptocurrency seized by the Government pursuant to a judicial seizure warrant, including from an account held in Wang's name into which the DEA deposited cryptocurrency.  Wang does not oppose the proposed forfeiture order.  (Dkt. 148)

As to Chen, the proposed forfeiture order requires Chen to forfeit all right, title, and interest in specific internet domain names that were seized by the Government pursuant to judicial seizure warrants in this case.    Nearly all the domain names, including amarvelbio.com and whwingroup.com, were registered in Chen's name.  Chen takes no position on the proposed forfeiture order.  (Dkt. 148).

### GUIDELINES CALCULATION

The Government agrees with the Probation Office's calculations of Wang and Chen's Guidelines ranges.  (Wang PSR ¶¶ 48–59, 62–63, 93; Chen PSR ¶¶ 50–61, 64–65, 97).  Because Wang and Chen have each objected to certain enhancements included in their Guidelines calculations, the Government sets forth below the relevant enhancements and why Wang and Chen's objections should be overruled.

As explained by the Probation Office, Wang's offense level includes a two-level mass marketing enhancement pursuant to U.S.S.G. § 2D1.11(b)(4), a two-level sophisticated laundering

enhancement pursuant to U.S.S.G. § 2S1.1(b)(3), and a four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a).[8] (Wang PSR ¶¶ 50, 52, 54). Wang's total offense level is 40, criminal history category is I, and resulting Guidelines range is 292 to 365 months' imprisonment. (Wang PSR ¶¶ 59, 63, 93).

Chen's Guidelines calculation differs from Wang's principally in two respects: (i) Chen receives a 3-point managerial enhancement pursuant to U.S.S.G. § 3B1.1(b), rather than Wang's 4-point leadership enhancement pursuant to U.S.S.G. § 3B1.1(a); and (ii) Chen receives a 2-point enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, based upon her perjury at trial, which is not applicable to Wang. (Chen PSR ¶¶ 56–57). On net, this results in an offense level of 41, which is one point greater than Wang's offense level of 40. (*Compare* Chen PSR ¶ 61 *with* Wang PSR ¶ 59). Chen's criminal history category is I, and her resulting Guidelines range is 324 to 405 months' imprisonment. (Chen PSR ¶¶ 65, 97).

## I.    Wang's Guidelines Objections

Wang raises three objections to his Guidelines calculation. First, he argues that the two-level sophisticated laundering enhancement, U.S.S.G. § 2S1.1(b)(3), should not apply because it improperly relies upon his use of cryptocurrency. (Wang Mem. 18–20). Second, Wang argues that the four-level leadership enhancement, U.S.S.G. § 3B1.1(a), should not apply because his conduct is "consistent with that of a salesman at a company that sold chemicals and should not be

---

[8] In calculating Wang and Chen's base offense level under the Chemical Quantity Table, U.S.S.G. § 2D1.11(e), the Probation Office properly analogized 1-boc-4-AP to piperidine. (Wang PSR ¶ 50; Chen PSR ¶ 52). Because 1-boc-4-AP is not listed in the Chemical Quantity Table, "the most analogous offense guideline" applies, pursuant to U.S.S.G. § 2X5.1. *See United States v. Miller*, 73 F. App'x 338, 341 (10th Cir. 2003) (considering analogous listed chemical). And because the trial testimony established that the structure of fentanyl contains a piperidine ring, (Tr. 805), that 1-boc-4-AP has a piperidine ring, (Tr. 805–06), and that 1-boc-4-AP contributes its piperidine ring when used to synthesize fentanyl, (Tr. 813), the most analogous offense guideline is that corresponding to piperidine.

considered as an aggravating factor." (Wang Mem. 20–21). Third, Wang argues that the two-level mass marketing enhancement, U.S.S.G. § 2D1.11(b)(4), should not apply because Wang "never agreed with Chen to the website sales processes" that Chen managed. (Wang Mem. 21–23). Each of these objections should be overruled.[9]

### A.    The Sophisticated Laundering Enhancement

U.S.S.G. § 2S1.1(b)(3) provides for a two-level increase where the defendant is convicted under 18 U.S.C. § 1956 and "the offense involved sophisticated laundering." "[S]ophisticated laundering" means "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense," typically involving the use of "(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1 app. n. 5. A defendant's use of cryptocurrency to create "financial obfuscation" may warrant the sophisticated laundering enhancement. *United States v. Mitan*, No. 21-5834, 2025 WL 1392242, at *6 (6th Cir. Apr. 9, 2025) ("Mitan's repeated use of digital currency, layered transfers, and foreign intermediaries

---

[9] Wang also raises factual objections to Paragraphs 15, 16, and 26 of his PSR. (Wang Mem. 15–18). Each of these paragraphs is factually accurate and supported by the trial record. To the extent that Wang argues the facts should be disregarded under U.S.S.G. § 1B1.3 because he was not personally aware of Chen's "website advertisement strategy," (Wang Mem. 17), or "the specific GX807-T thread between Yang and the CS-1," (Wang Mem. 18), the argument is meritless because Chen and Yang took these actions — *i.e.*, selling precursor chemicals to customers — within the scope and in furtherance of Wang's chemical importation business, and their actions were reasonably foreseeable to Wang. U.S.S.G. § 1B1.3(a)(1)(B). Moreover, Section 1B1.3 defines the "relevant conduct" that can determine the Guidelines range, and does not limit what facts the Court may consider in determining the appropriate sentence under 18 U.S.C. § 3553(a). *See United States v. Wernick*, 691 F.3d 108, 119 (2d Cir. 2012) ("Our conclusion that Wernick's acts against young children are not technically 'relevant conduct' to the specific offense charged in Count Five does not imply that those acts are not highly relevant (in a non-technical sense) to the district court's evaluation.").

comfortably fits within the scope of conduct warranting the enhancement.").[10]  And the use of a single sophisticated technique can be enough.  *See United States v. Abdullaev*, 761 F. App'x 78, 86 (2d Cir. 2019) (affirming sophisticated laundering enhancement based on defendant's use of a single corporate "alter ego and shell corporation").

The Probation Office correctly found that the sophisticated laundering enhancement applies to Wang's conduct because he and his confederates "utilized multiple interchangeable corporate entities, maintained several cryptocurrency accounts which were held in different names to receive funds, accounts were frequently changed to diversify the risk of detection, and at least one of the accounts was based offshore."  (Wang PSR ¶ 52).  Wang and Chen "used at least three different cryptocurrency accounts held in three different names in connection with the controlled purchases made during the offense."  (Wang PSR ¶ 39).  That included an OKX account held in the name of Guang Xia — who is Fengzhi Xia's son, (Tr. 1129) — which received a payment of $1,180 in cryptocurrency in January 2023;[11] an OKX account held in Wang's name, which received payments of approximately $4,972 in cryptocurrency in March 2023 and approximately $40,934 in cryptocurrency in April 2023, (GX 304; Tr. 198, 242–43); and an OKX account held in the name of Bingbing Xia — who is Wang's wife, (Wang Mem. 5, 11) — which received a payment of approximately $20,081 in cryptocurrency in May 2023, (DX A; Tr. 667, 679).  OKX is based in the Seychelles, (Wang PSR ¶ 39; Chen PSR ¶ 41), making each of these cryptocurrency

---

[10] Unless otherwise specified, all case quotations omit internal quotation marks, citations, and prior alterations.

[11] The Government provided records identifying Guang Xia as the owner of this account to the defendants in discovery and to the Probation Office to assist in the preparation of the PSRs.  Wang asserted that Guang Xia received payment for the January 2023 order in Wang's post-trial Rule 29 motion.  (Dkt. 135 at 2).

accounts an "offshore financial account[]," U.S.S.G. 2S1.1 app. n. 5. This alone is sufficient to warrant the sophisticated laundering enhancement.

Moreover, the evidence at trial established that Wang and his co-conspirators used cryptocurrency to conceal their illicit activities. For example, Yang assured CS Jose that he did not need to "worry about payment issues being traced, as most of our customers use Bitcoin and Western Union for payment and are always safe." (GX 401 at 9; Tr. 164). Later, Yang also explained to CS Jose that she was sending new cryptocurrency deposit addresses because "[m]y boss's bitcoin account and USDT account have been closed because he receives payments too often." (GX 401 at 37; Tr. 195).[12] This shows that Wang and his confederates cycled through cryptocurrency accounts held in different people's names (including Wang and his wife's) despite at times being shut down by the hosting cryptocurrency exchange — in other words, to create "financial obfuscation." *Mitan*, 2025 WL 1392242, at *6. Yang's statements also show that whatever the virtues of cryptocurrency as a "transparent and now regulated technology," (Wang Mem. 18–19),[13] Wang and his confederates used cryptocurrency in this case to avoid "payment issues being traced," (GX 401 at 9; Tr. 164).

---

[12] Wang distances himself from Yang's statements, arguing that "there is no evidence or testimony linking [Yang's] statement to Mr. Wang in any way and it should not be considered as relevant conduct for assessing Mr. Wang's culpability for sentencing." (Wang Mem. 20). But Wang received three of the four controlled cryptocurrency payments in this case (two directly, and one through his wife), thus demonstrating that Yang's statements soliciting payment in cryptocurrency were within the scope of her and Wang's jointly undertaken chemical importation and money laundering activities, in furtherance of those unlawful activities, and reasonably foreseeable to Wang. U.S.S.G. § 1B1.3(a)(1)(B).

[13] Wang cites the recently enacted GENIUS Act, but he does not explain why the sophisticated laundering enhancement is "[c]ontrary to the new law." (Wang Mem. 18). Wang also cites the CLARITY Act, (Wang Mem. 18), but that is proposed legislation, not law.

Finally, the evidence at trial established that Wang and his confederates used at least two entities — Amarvel Biotech and Wingroup Pharmaceutical — as interchangeable versions of their precursor business. This evidence included: (i) Wang's use of the handle "wingroup-wang" when texting Chen and Yang, (Tr. 1067–83; GX 806-T); (ii) Chen's testimony that Wingroup Pharmaceutical and Amarvel Biotech used the same physical office space, (Tr. 1128–29); (iii) Chen's testimony that Wingroup Pharmaceutical and Amarvel Biotech were both funded by Fengzhi Xia, whom Wang and Chen identified to CS Gil as the other "boss" of the precursor shipping business, (Tr. 488–89, 1129; GX 502I-T); (iv) photographs, introduced at trial by Chen, showing Chen, Wang, F. Xia, and employees of Wingroup Pharmaceutical and Amarvel Biotech at an event together, (Tr. 1131–33; DX A14, A15); and (v) Chen's registration and operation of the Wingroup Pharmaceutical and Amarvel Biotech websites, (GX 301A, 301G; Tr. 935–36, 1009–10). Though the controlled purchases in this case involved Amarvel Biotech, Chen's laptop also contained images offering fentanyl precursors under the Wingroup Pharmaceutical brand. (Tr. 1010–14; GX 743, 744, 746–749). The evidence thus established that Wang and his confederates used Wingroup Pharmaceutical as an "alter ego and shell corporation," *Abdullaev*, 761 F. App'x at 86, to sell drug precursors.

### B.     The Leadership Enhancement

U.S.S.G § 3B1.1(a) provides for a four-level increase in the offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." This enhancement has two elements. First, the criminal activity must involve at least five participants or be otherwise extensive. "The requirements of § 3B1.1(b) are met if the defendant was a manager or supervisor and the criminal activity itself involved at least five participants; the defendant need not be the manager of more than one other person." *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995). Second, the defendant must have acted

as an "organizer or leader." A defendant is a leader or organizer where he "played a crucial role in the planning, coordination, and implementation of [the] criminal scheme." *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000). A conspiracy can have multiple leaders. *United States v. Duncan*, 42 F.3d 97, 106 n.6 (2d Cir. 1994) ("[O]ne conspirator's leadership role is not dispositive on the question of whether another was also a leader.").

In considering whether a criminal activity is "otherwise extensive," a sentencing court must examine whether the activity is "the functional equivalent of one involving five or more knowing participants." *United States v. Carrozzella*, 105 F.3d 796, 803 (2d Cir. 1997). The following factors are relevant: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Id.* at 803–04. Although the inquiry is "based primarily on the number of people involved in criminal activity, factors other than head counting may be properly considered in the 'otherwise extensive' determination," so long as they do not double-count offense level adjustments. *United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016).

The Probation Office assigned Wang a four-level leadership enhancement because he "presented himself as one of two bosses at Amarvel Biotech, which employed more than twelve people, including marketing specialists and sales representatives," and because "Wang approved and oversaw the pricing of chemicals, shipment of the chemicals, and confirmed receipt of payment for chemical purchases." (Wang PSR ¶ 54). The Probation Office was correct. The criminal activity involved at least five knowing participants: Wang, Chen, Yang, the six other sales representatives listed on Amarvel Biotech's website (GX 206), and the employee hired by Chen "specifically to work on advertisement on Google" (Tr. 1130). The criminal activity was

also otherwise extensive:  In addition to the number of knowing participants, Amarvel Biotech's website indicated that in one year alone, it had shipped orders to 278 customers in 63 countries (GX 206), and Wang and Chen stated at the meeting in Bangkok that they had already shipped seven tons to the United States that month alone (GX 502M-T; Tr. 499).  Finally, Wang was the "boss" of the precursor shipment business, as he himself admitted.  (GX 806-T at 54 (Wang: "Director Wang has the final say over here."); GX 502I-T (Wang:  "I'm the boss in charge of this piece of business.").

Wang disputes the number of participants in the scheme, arguing that the six other representatives listed on Amarvel Biotech's websites and the employee hired by Chen to address its Google Ads problem may have been incidental and unknowing participants in the scheme.  (Wang Mem. 20–21).  Given that the Amarvel Biotech website explicitly offered the sale of methylamine and 1-boc-4-AP for delivery worldwide, including specifically the United States, (GX 202, 204–206), the six other sales representatives listed on the website were clearly knowing participants in the chemical importation scheme.  At a minimum, they were "unknowing participants organized by the defendant to render services peculiar and necessary to the criminal scheme," *Kent*, 821 F.3d at 370, making them functionally knowing participants for the "otherwise extensive" analysis, *see Carrozzella*, 105 F.3d at 803.  As for Chen's subordinate, Chen testified that she hired a "Google Ad specialist," (Tr. 1150), to address Amarvel Biotech's violations of Google's advertising policies involving the word "fentanyl," (Tr. 1181).  This "specialist," too, is a knowing participant, since the specialist necessarily reviewed both Amarvel Biotech's fentanyl-related advertisements and Google's violation notifications.  At a minimum, the Google Ads specialist was an unknowing participant recruited to render services specific to the criminal scheme — *i.e.*, restoration of Amarvel Biotech's ability to advertise fentanyl precursors.  Neither the sales

representatives nor the Google Ads specialist is remotely analogous to the excludable "taxi driver who brought a leader of the fraudulent scheme to work on a single occasion." *Carrozzella*, 105 F.3d at 804.

Wang also suggests that he was not really the "boss" but was rather a mere "salesman." (Wang Mem. 20–21). This minimization highlights Wang's continued refusal to accept responsibility for his criminal conduct. The evidence at trial established that Wang approved the pricing and shipment of precursor chemicals, received most of the cryptocurrency payments, and, in his own words, had the "final say" over the precursor business. (GX 401 at 13, 15–16; GX 304-T; GX 806-T at 54; Tr. 168–70, 197–98, 242–43, 1082). Wang's "exercise of decision-making authority," "nature of participation in the commission of the offense," "claimed right to a larger share of the fruits of the crime," and "degree of control and authority exercised over others," U.S.S.G. 3B1.1 app. n. 4, all point towards his leadership of the criminal activity.

### C.    The Mass Marketing Enhancement

U.S.S.G. § 2D1.11(b)(4) provides for a two-level enhancement where "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a listed chemical through mass-marketing by means of an interactive computer service." Operating a website to sell listed chemicals to the public is a textbook example of conduct warranting the mass-marketing enhancement. U.S.S.G. § 2D1.11 app. n. 5 ("For example, subsection (b)(4) would apply to a defendant who operated a web site to promote the sale of Gamma-butyrolactone (GBL) but would not apply to coconspirators who use an interactive computer service only to communicate with one another in furtherance of the offense.").

Wang does not dispute that Amarvel Biotech's use of websites to market methylamine and 1-boc-4-AP triggers the mass-marketing enhancement. Instead, Wang assigns sole blame to Chen,

arguing that he "never agreed with Chen to the website sales processes." (Wang Mem. 22).[14] Evidence at trial established that Wang was well aware of the Amarvel Biotech website, including Wang's April 25, 2023 text message to Chen asking, "Still can't push ads on the official website?", to which Chen replied, "Appeals in progress." (GX 808B-T). This exchange demonstrates not only that Wang knew of the Amarvel Biotech website, but that he was specifically aware of Chen's efforts to appeal the company's Google Ads violations for fentanyl-related advertising. Even imagining *arguendo* that Wang — the boss of the business — was somehow unaware that the business was marketing to customers online, Chen's online advertising was certainly within the scope of their jointly undertaken chemical importation activity, in furtherance of that activity, and reasonably foreseeable to Wang. U.S.S.G. § 1B1.3(a)(1)(B). After all, Chen testified that she had constructed the websites not only for Amarvel Biotech and Wingroup Pharmaceutical, but also for two other companies that were co-located and under common investment by Wang's partner, Fengzhi Xia. (Tr. 1128–29, 1135); *see, e.g.*, *United States v. Gillon*, No. 20-4177, 2023 WL 8177113, at *5 (2d Cir. Nov. 27, 2023) ("[I]n the context of jointly undertaken criminal activity, the acts or omissions of others constitute relevant conduct if they were within the scope of the jointly undertaken activity, in furtherance of the activity, and reasonably foreseeable in connection with the activity. USSG § 1B1.3. The evidence at trial showed that Gillon and Williams worked together with Aguirre and moved narcotics between themselves, so it was not an abuse of discretion for the district court to group Gillon's activities with Williams'.").

---

[14] Wang also declares that the "the January 2023 shipment cannot be used against [him] for sentencing because he did not join the conspiracy until March 17, 2023," (Wang Mem. 22), but it is not clear how this argument has any bearing on his objection to the mass marketing enhancement. In any event, Wang can clearly be sentenced on the January 2023 shipment for the simple reason that he was found guilty in Counts Three and Four of importing 1-boc-4-AP and methylamine in connection with the January 2023 shipment, and the Court has rejected his Rule 29 motion for acquittal on Count Four. (Dkt. 156 at 33).

## II.    Chen's Guidelines Objections

Chen raises one objection to her Guidelines calculation, [15] arguing that Probation's application of the two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, is improper "as a matter of law" because the PSR "did not cite" certain Supreme Court and Second Circuit case law.  (Chen Mem. 10–11).  Chen's objection is without merit.  The obstruction of justice enhancement clearly applies to Chen because, as set forth in her PSR, (*see* Chen PSR ¶ 17), and further discussed below, Chen willfully and materially committed perjury at trial.

U.S.S.G. § 3C1.1 provides for a two-level enhancement if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  The application notes specifically list, as a type of conduct to which the obstruction of justice enhancement applies, "committing, suborning, or attempting to suborn perjury."  U.S.S.G. § 3C1.1, app. n. 4(B).  Perjury is thus a paradigmatic example of obstruction of justice.  "[A] defendant's right to testify does not include a right to commit perjury," *United States v. Dunnigan*, 507 U.S. 87, 96 (1993), and "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines," *id.* at 98.

In order to apply an obstruction enhancement based upon perjury, a sentencing court must find that the defendant "1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Zagari*, 111

---

[15] Chen's sentencing memorandum also noted several "non-substantive objections" to the PSR (Chen Mem. 9-10) to which the Government either did not object or deferred to the discretion of Probation in resolving, as detailed in the PSR.  (Chen PSR at pp. 26-27).

F.3d 307, 329 (2d Cir. 1997); *accord Dunnigan*, 507 U.S. at 94.  Where, as here, "a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under th[is] perjury definition." *United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001).  As the Second Circuit has explained, the Supreme Court in *Dunnigan* held that the enhancement was sufficiently supported where the sentencing court found that the defendant was "untruthful at trial with respect to material matters in the case and that her false testimony was designed to substantially affect the outcome of the case." *United States v. Norman*, 776 F.3d 67, 84 (2d Cir. 2015) (internal quotation marks and citation omitted).  Further, where "the defendant's testimony relates to an essential element of his offense, such as his state of mind . . . , the judgment of conviction necessarily constitutes a finding that the contested testimony was false.  Accordingly, assuming that the evidence also persuades the sentencing judge that the defendant knew, at the time of testifying, that the statements to which he testified were untrue, a section 3C1.1 enhancement would be appropriate." *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991).

Chen willfully and materially committed perjury in at least four ways.

First, Chen falsely testified that she did not recognize product webpages for 1-boc-4-AP, 1-boc-4-piperidone, and methylamine on various Amarvel Biotech websites, (Tr. 1136–40).  For example, Chen testified that she did not "recognize" and did not "create" GX 203, which is a product page on Amarvel Biotech's primary website for 1-boc-4-piperidone.  (Tr. 1136).  GX 203 contains a photograph of 1-boc-4-piperidone powder that is virtually identical to a photograph found on Chen's laptop, as shown below (*compare* GX 203 (left) *with* GX 719 (right)):



Likewise, Chen testified that she did not recognize Government Exhibit 208 (Tr. 1138), which is an Amarvel Biotech product webpage describing 1-boc-4-AP as an "[i]ntermediate in the preparation of Fentanyl derivatives," (GX 208). A text file found on Chen's laptop, however, contains product listing information for 1-boc-4-AP, including the identical phrase "[i]ntermediate in the preparation of Fentanyl derivatives." (GX 745). Whether Chen created these webpages was a material issue at trial, and Chen's testimony that she did not even "recognize" these webpages, despite maintaining virtually identical imagery and text on her laptop, was willfully false.

Second, Chen falsely testified that when CS Gil discussed fentanyl at the Bangkok meeting, Chen understood him to be saying that "he wanted to build grand labs in New York, and he wanted to find professional team to assist to him to develop a better, safer product that way he could save lives." (Tr. 1193). In fact, as reflected in the recording of the meeting, CS Gil told Chen that he was setting up labs in the United States because "sometimes I lose product" while moving fentanyl from Mexico to the United States "because of the legality behind it." (GX 502D-T; Tr. 476). Chen

then translated into Mandarin for Wang: "[H]e used to produce in Mexico, and then ship it to the United States for sale. However, when crossing the border, it would be seized . . . ." (GX 502D-T). In response, Wang told Chen that CS Gil's idea of setting up a fentanyl laboratory in the United States was "very correct" because "in America, our logistics are fastest." (GX 502D-T). Whether Chen intended, knew, or had reason to believe that the precursors she sold would be used to manufacture fentanyl was a material issue at trial, and Chen's testimony that she believed CS Gil was planning to "build grand labs" to "save lives" was willfully false.

Third, Chen falsely testified that in Fiji, she did not think that CS Gil "was intending to violate the laws of the United States." (Tr. 1249). As set forth above, CS Gil had told Chen months earlier, in Bangkok, that his fentanyl had been seized at the Mexico-U.S. border "because of the legality behind it." (GX 502D-T; Tr. 476). Moreover, as reflected in the recording of the meeting, Chen asked CS Gil in Fiji "[i]f our products . . . blocked by the police," whether CS Gil had any way to get the products out. (GX 505C-T; Tr. 605–06). Whether Chen knew that the 1-boc-4-AP she was selling was controlled or regulated by the United States was a material issue at trial, and her testimony that she did not think CS Gil was intending to violate the laws of the United States was willfully false.

Fourth, Chen falsely testified that when she read the three Voice of America articles in April 2023, she found the articles "unimaginable" and "very confusing." (Tr. 1196). At the Fiji meeting, however, Chen straightforwardly explained to CS Gil the substance of one of the articles: "recently American government uh seized, some Mexican, Mexican group and uh, they, they follow the route to China" and found "[our] . . . [c]ompetitor in China," which was "bad news for us." (GX 505B-T). Not only did Chen communicate with CS Gil and CS Jose in English in this case, but her command of the language was so strong that she corrected her own interpreter during

the trial. (Tr. 1127–28). Even the 14-page handwritten letter that Chen has submitted in connection with her sentencing is in excellent English. (Dkt. 160-1). Whether Chen knew that the 1-boc-4-AP she was selling was controlled or regulated by the United States was a material issue at trial, and her testimony that she found "unimaginable" and "very confusing" the Voice of America articles — which described the illegality under U.S. law of selling fentanyl precursors — was willfully false.

These clear-cut instances of false testimony by Chen are more than enough to impose an enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1 app. n. 4(B); *United States v. Matos*, 907 F.2d 274, 275–76 (2d Cir. 1990) (upholding imposition of two-level upward adjustment where defendant offered testimony that was flatly contradicted by the record). To be sure, the obstruction of justice enhancement "is not intended to punish a defendant for the exercise of a constitutional right" and that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory . . . ." U.S.S.G. § 3C1.1, app. n. 2. But because "[t]here is no protected right to commit perjury," *United States v. Grayson*, 438 U.S. 41, 54 (1978), penalizing a defendant at sentencing for lying at trial does not violate the defendant's right to testify on her own behalf. Where, as here, a defendant willfully and materially perjures herself, "[i]t is rational for a sentencing authority to conclude that a defendant . . . [is] attempt[ing] to avoid responsibility" and therefore is "more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process." *Dunnigan*, 507 U.S. at 97. That is because "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with

32

the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *Id.* at 97-98.

Finally, an enhancement for obstruction of justice is warranted where, as here, the jury verdict contradicts the defendant's factual testimony. *See United States v. Stewart*, 686 F.3d 156, 174-78 (2d Cir. 2012) (affirming obstruction enhancement where "[t]he jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly"); *Bonds*, 933 F.2d at 155 ("[B]y finding Bonds guilty of *knowingly* distributing counterfeit money, the jury necessarily determined that Bonds knew that the money he had distributed was counterfeit" and, therefore, that Bonds lied at trial). Here, the jury's verdict on Count Two, including its finding that Chen knew or had reasonable cause to believe that the 1-boc-4-AP would be used to manufacture fentanyl, (Tr. 1543-44), flatly contradicts Chen's factual testimony that even in Fiji, where she was arrested, she did not think that CS Gil "was intending to violate the laws of the United States." (Tr. 1249). Indeed, as the Court found in its opinion denying Chen's Rule 29 and 33 motions, "the evidence of Chen's involvement with the Amarvel Biotech websites," alone, "supported an inference that Chen was aware that Amarvel Biotech was selling precursor chemicals such as 1-boc-4-AP that could be used to make fentanyl, and that the company used deceptive packaging to avoid detection by U.S. customs and law enforcement." (Dkt. 156 at 41). The Court further explained as follows:

> Given the evidence that Chen had registered Amarvel Biotech's websites (see GX 301A to 301G), Yang's statement to Jose that "Chiron is responsible for the operation of our company's website" (GX 401 at 57), Google's complaints to Chen about the presence of the word "fentanyl" in Amarvel Biotech's ads (GX 810-813), and the presence of promotional material from Amarvel Biotech website pages on Chen's laptop (GX 745 (text file found on Chen's laptop containing a product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives")), a reasonable jury could have found that Chen was

33

> aware of the content on the Amarvel Biotech websites – including
> advertisements for l-boc-4-AP.  Acknowledging Chen's testimony
> that she did not recognize certain Amarvel Biotech website pages
> (see Tr. 1136-40), the jury was not required to accept Chen's
> account.

*Id.* at 41.  Here, the "jury's resolution of conflicting evidence," *see United States v. Archer*, 977

F.3d 181, 188 (2d Cir. 2020), and the resulting verdict finding Chen guilty on Count Two,

underscore that the jury rejected Chen's contradictory testimony as false.  Accordingly, imposition

of the obstruction enhancement is warranted.

## THE APPROPRIATE SENTENCE

"The nation is in the midst of a shockingly severe fentanyl crisis."  *United States v. Roy*,

88 F.4th 525, 532 (4th Cir. 2023).   In 2024, approximately 80,391 Americans died of drug

overdoses — 220 people per day — with the majority of the deaths involving synthetic opioids

like fentanyl and fentanyl analogues.[16]  That same year, the DEA seized more than 60 million

fentanyl-laced pills and nearly 8,000 pounds of fentanyl powder.[17]  At two milligrams to a deadly

dose, the DEA's 2024 seizures are equivalent to more than 380 million lethal doses — enough to

kill every person in the United States.[18]

Wang and Chen fueled the fentanyl crisis.  Through their commercial enterprise, they

advertised the shipment of fentanyl precursors to buyers worldwide, specifically targeting Mexican

distributors — which, in turn, drives the fentanyl epidemic in the United States — with promises

---

[16] U.S. Centers for Disease Control and Prevention, *U.S. Overdose Deaths Decrease Almost 27% in 2024*, https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2025/20250514.htm (last visited July 22, 2025).

[17] U.S. Drug Enforcement Administration, One Pill Can Kill, *https://www.dea.gov/onepill* (last visited July 22, 2025).

[18] *Id.*

of "100% stealth shipping" and "Mexico hot sale." After meeting a new customer they believed to be a Mexican drug trafficker, they jumped at the opportunity and shipped more than 200 kilograms of fentanyl-related precursor chemicals straight to California. They boasted how, mid-way into March 2023, they had already shipped *seven tons* of chemicals to America and could add another three or five tons without issue. Even after Chen specifically researched news articles describing the U.S. Government's efforts to combat fentanyl trafficking by sanctioning and indicting representatives of Shuokang, another Chinese precursor shipping company, Chen and Wang did not stop. Instead, they flew to Fiji to finalize an even larger, more lucrative deal with their buyer — three tons of fentanyl precursors — where Wang and Chen openly mused about the risk of one day following Shuokang's fate.

That day is now here. A jury has convicted Wang and Chen of chemical importation and money laundering offenses, and they now await sentencing under the familiar Section 3553(a) factors. For both Wang and Chen, the need to reflect the seriousness of the offense, to provide just punishment, and to deter and incapacitate warrant a lengthy baseline sentence. *See* 18 U.S.C. § 3553(a)(2)(A)–(C). Wang merits a significant upward adjustment to reflect his leadership of the enterprise. *See* 18 U.S.C. § 3553(a)(1). And Chen merits a significant upward adjustment because she lied at trial. *See* 18 U.S.C. § 3553(a)(2)(A). Balancing these factors against the individual circumstances of each defendant, including their ages and lack of criminal history, and consistent with other sentences imposed in drug precursor cases, the Government respectfully submits that a sentence of at least 240 months' imprisonment for Wang and a sentence of at least 216 months' imprisonment for Chen is necessary to serve the purposes of sentencing.

I.    **The Court Should Sentence Wang to at Least 240 Months' Imprisonment, and Chen to at Least 216 Months' Imprisonment**

A.    **The Seriousness of the Offense and the Need for Just Punishment**

It is almost impossible to overstate the seriousness of Wang and Chen's crimes. They operated a business that explicitly offered to supply, in wholesale quantities, the ingredients to make fentanyl and other dangerous drugs. They did not apply even the thinnest veneer of lawful purpose. Webpage after webpage — registered and built by Chen — echoed the same phrase: "Intermediate in the preparation of Fentanyl derivatives." Webpage after webpage advertised shipping chemicals in fake or concealed packaging, like engine oil, dog feed, beeswax, and nuts. When they heard from their customer, CS Gil, that the fentanyl he had made from a prior Amarvel Biotech shipment had purportedly killed several Americans, Wang and Chen did not pump the brakes. They accelerated. Wang assured CS Gil that after doing more business together, he would provide technical assistance with the formula for fentanyl, and Wang and Chen went on to brag about their ongoing ton-quantity shipments into the United States.

These were not idle boasts. In January 2023, Wang authorized the shipment of one kilogram each of two different fentanyl precursors, and nearly 900 grams of a methamphetamine precursor, directly to New York. In May 2023, Wang and Chen shipped more than 200 kilograms of precursor chemicals for a fentanyl analogue directly to California.[19] Wang and Chen anticipated that the May 2023 shipment would be used to make 50 to 55 kilograms of fentanyl. That quantity

---

[19] In an expert report, DEA pharmacologist Luli Akinfiresoye explained that the fentanyl analogue, ortho-methylfentanyl, has "depressant effects on the central nervous system that is similar to the depressant effects on the central nervous system" as fentanyl, and that studies showed ortho-methylfentanyl and fentanyl are "equipotent as analgesics." (Dkt. 100-1). The Court denied the defense motions *in limine* to preclude Dr. Akinfiresoye's testimony, (Transcript of January 8, 2025 Final Pretrial Conference at 38), but ultimately excluded the testimony on relevance grounds, (Tr. 911).

alone is enough to kill 25 million people — roughly the entire population of the New York City metropolitan area. *See United States v. Yates*, No. 22-3003-cr, 2024 WL 1338762, at *3 (2d Cir. Mar. 29, 2024) (affirming 180-month sentence on driver who ferried nearly 10 kilograms of fentanyl, where district court estimated the quantity could potentially kill nearly 5 million people to illustrate the seriousness of the offense).

In *United States v. Swafford* (*Swafford III*), 639 F.3d 265 (6th Cir. 2011), the Sixth Circuit affirmed a 360-month sentence on facts analogous to those here. Swafford was convicted at trial of 40 counts "related to the sale of iodine, a necessary ingredient in the production of methamphetamine." *United States v. Swafford* (*Swafford I*), 512 F.3d 833, 838 (6th Cir. 2008). The trial evidence established that for years, Swafford supplied iodine to "approximately 20 former Broadway customers and admitted methamphetamine 'cooks,'" and that Swafford "was aware that the iodine was destined for methamphetamine production." *Id.* On direct appeal, the Sixth Circuit overturned 21 of the 40 counts on variance and multiplicity grounds, and remanded for resentencing on the remaining 19 counts of substantive distribution of iodine, knowing and having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2). *Id.* at 838, 846. On resentencing, the district court imposed a sentence of 360 months' imprisonment — near the top of the Guidelines range of 292 to 365 months' imprisonment — and the Sixth Circuit affirmed.[20] *Swafford III*, 639 F.3d at 267.

Wang and Chen's conduct is no less serious than Swafford's. Swafford distributed approximately 3,113 gallons of iodine, which could have been used to produce 424 kilograms of

---

[20] The district court in *Swafford* applied the cross-reference in U.S.S.G. § 2D1.11(c)(1) because the offense "involved unlawfully manufacturing a controlled substance." *Swafford II*, 639 F.3d at 267. The Government does not seek application of that cross-reference here due to the new limitations on the use of acquitted conduct in U.S.S.G. § 1B1.3(c).

methamphetamine.  *United States v. Swafford* (*Swafford II*), No. 04 Cr. 138, 2008 WL 5204064, at *3 (E.D. Tenn. Dec. 11, 2008).  Wang and Chen distributed more than 200 kilograms of fentanyl precursors in a single controlled purchase, with the aim of producing 50 to 55 kilograms of fentanyl, and then flew to Fiji to finalize a deal for 15 times that quantity — that is, three tons of precursors, with the aim of producing at least 750 kilograms of fentanyl.  And that is in connection with this investigation alone; Wang and Chen made clear that they had other customers too, who undoubtedly used their chemicals to create deadly end products.  Moreover, unlike Swanson, Wang and Chen operated on a global scale, working with a stable of sales representatives and offering to ship their precursors around the world.

In urging a lower sentence, Swanson pointed out that he was 64 years old, was earning no income, and had served honorably in the Army.  *Id.* at *8.  The sentencing court acknowledged these considerations but found a 360-month sentence necessary to afford "just punishment and deterrence given the unprecedented quantities of iodine Defendant sold."  *Id.*  The same is true here.

### B.      Deterrence and Incapacitation

Like *Swafford*, this case calls out for general deterrence.  By virtue of proximity, most drug cases are brought at the tail end of the supply chain, where sellers meet buyers of the finished drugs.  This case instead shines a light on the very beginning of the supply chain, where the raw drug ingredients are manufactured and sold at massive scale.  Particularly given the difficulty of apprehending offenders in foreign countries, this case presents the extraordinarily rare opportunity for the Court to send a message to exporters of drug precursors worldwide.  *See United States v. Davis*, 82 F.4th 190, 202 (2d Cir. 2023) (affirming a sentence more than double the high-end of the Guidelines range because, in part, courts should "factor in the need for a sentence to provide adequate general deterrent value").

This case also calls for incapacitation.  Neither Wang and nor Chen's sentencing submissions even acknowledge the gravity of their crimes, let alone express any remorse.  On the contrary, Wang and Chen make clear that they believe they did nothing wrong.  (*See* Wang Mem. 23 (Wang insisting that "[w]hat he has had to endure is enough" because he was "lured by the promise of a business deal concocted by the DEA" and was "snatched in Fiji without having been able to properly say goodbye to his family"); Chen Mem. 8, 15 (Chen declaring that she was "naïve about the industry and clueless about the transactions negotiated by Anita," and suggesting that she never "said no to the Confidential Sources" because "having a public confrontation is not consistent with Chinese business practices, even if they really can't do it")).  But if Wang and Chen do not believe that they did anything wrong, but merely had the bad luck of getting "lured" by the DEA, then they have every reason to return to their highly lucrative precursor business when they are released and returned to China.

The technical and language skills that Chen used to market precursors to the world, and the industry and investor connections that Wang leveraged to build Amarvel Biotech into a large-scale international supplier, are durable.  It is not a question of whether Wang and Chen *can* resume the fentanyl precursor business upon their return to China, but whether they *will*.  Given that China has no extradition treaty with the United States, specific deterrence is not in the cards; Wang and Chen can avoid future punishment in the United States simply by never setting foot outside China again.  Given Wang and Chen's ability to restart their precursor supply business, their apparent belief that there is nothing wrong with doing that, and the likely inability of the Government to apprehend them again, the Court should impose a sentence that will "protect the public from further crimes of the defendant[s]," 18 U.S.C. § 3553(a)(2)(C).

### C.    Wang's Leadership Role

The need to reflect the seriousness of the offense, to provide just punishment, and to deter and incapacitate — considerations that apply to both Wang and Chen — would, standing alone, justify a sentence equal to the 30 years imposed on Swafford. But Wang stands apart from Chen (and Swafford) in that Wang was, in his own words, the "boss in charge of this piece of business." (GX 502I-T). Wang approved orders, led negotiations in Bangkok and Fiji, and received the lion's share of the proceeds. And he managed the other employees of Amarvel Biotech, including Chen and Yang. As the leader of the enterprise, Wang is the most culpable participant and deserves the greatest punishment.

It is striking to read Wang's sentencing submission, in which he declares himself "not the criminal mastermind the government attempted to portray, but rather someone way down in the totem pole." (Wang Mem. 23). Wang's newfound modesty stands in relief not only to his declarations of authority during his meetings and video calls with CS Gil, (*e.g.*, GX 502I-T), but also to his private communications with Chen and Wang. For example, in his private group chat with Chen and Yang, Wang directed Yang to "make it clear to [CS Gil] that both Director Xia and I are the bosses, Director Xia is not responsible for any actual work, and Director Wang has the final say over here." (GX 806-T at 54). Later, when Yang reported in the group chat that CS Gil wanted a video call, Wang brushed off the request, writing: "I don't have [time]. Please send the specific questions to the group [chat], I will see them." (GX 806-T at 56).

Wang's private chats similarly undercut his protestations that he did not know what Yang was doing for Amarvel Biotech. (Wang Mem. 18–20, 23 n.10). In a May 2023 text message, (GX 808A-T at 1), Wang sent Chen a screenshot of Wang's text message exchange with Yang, (GX 808A-1T). In that screenshot, Yang reported to Wang "Moscow, 200 kg, self-pickup at 1451," apparently referring to a pickup of a chemical shipment in Moscow. (GX 808A-1T). A few days

later, Wang texted, "Has the U.S. shipment been picked up by the client?" and Yang replied, "It has been picked up." (GX 808A-1T). Later that day, Yang texted Wang that she could not attend a video call with CS Gil because Yang had a "facial allergy" and was "currently at the hospital." (GX 808A-1T). Referring to this message, Wang sarcastically texted Chen: "Look at the last paragraph, does it seem like Er Yang is the leader?" (GX 808A-T at 2). Chen responded in kind, exclaiming, "Does having an allergic reaction on your face mean you can't speak?" (GX 808A-T at 4). These candid and revealing chats demonstrate that Yang regularly kept Wang apprised of her chemical shipments, and that Wang requested and received updates from Yang on the same. The chats also demonstrate that if anyone was "way down in the totem pole" in Wang's eyes, (Wang Mem. 23), it was Yang.

### D.      Chen's Perjury at Trial

Unlike Wang, Chen was not the leader of the fentanyl precursor business, though she was indispensable in marketing the precursors to the outside world. Chen also personally recruited another person, a Google Ads specialist, earning her a managerial enhancement. But Chen's standout aggravator — one not shared by Wang — is her perjury at trial. While every defendant has the right to testify, no defendant has the right to lie. Chen's brazen perjury "undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." *United States v. Alvarez*, 567 U.S. 709, 720–21 (2012) (plurality opinion). Her sentence should reflect the systemic danger imposed by her lying under oath to this Court and to the jury.

## II.      Wang's Arguments for Leniency

Wang argues for leniency principally based upon what he argues was his difficult upbringing, his economic and emotional support to his family, and the conditions of the Metropolitan Detention Center ("MDC"). (Wang Mem. 2–15). These considerations are shared

across many (if not most) criminal defendants in this District, and the support Wang apparently provided to his own family came at the expense of the untold and nameless families whose lives were shattered by the drug precursors he shipped. Wang's sentencing submission shows no scrap of acknowledgment, much less remorse, for the harm he has caused. Instead, he blames the Government for "lur[ing]" him with the "the promise of a business deal concocted by the DEA." (Wang Mem. 23).

Wang's anger is a cynical effort to deflect responsibility for his crimes onto the DEA. And it misses the point of the undercover operation in this case. As the Supreme Court has explained, "the infiltration of drug rings and a limited participation in their unlawful *present* practices" is sometimes the "only practicable means of detection." *United States v. Russell*, 411 U.S. 423, 432 (1973) (emphasis added). Nobody "lured" Wang into selling drug precursors. When he met CS Gil in March 2023, Wang bragged that he had already shipped seven tons of chemicals to the United States in that month alone. (GX 502M-T; Tr. 499). Amarvel Biotech's website, which openly advertised the sale of fentanyl and methamphetamine precursors, was registered by Chen in April 2022 — more than a year before CS Jose first contacted the company to make a controlled purchase in November 2023. (GX 301A; Tr. 935–36). The DEA did not trick Wang into selling drug precursors; it caught him red-handed doing what he was already doing.

## III.    Chen's Arguments for Leniency

Chen's arguments in support of her position that the Court should impose a sentence of 30 months largely amount to a proclamation of innocence and reflect an alternate reality in stark contrast to the evidence that was presented at trial and resulted in the jury's unanimous guilty verdict as to her on Count Two and Count Five. Accordingly, Chen's arguments do not merit serious consideration, and the Court should reject them.

Chen, in her sentencing memorandum as well as her handwritten letter to the Court, maintains that her conduct was limited to merely "serving as a translator between Bruce Wang and customers via video calls and in-person meetings," having been "assigned two temporary roles at Amarvel Biotech" from March 18 to 26, 2023 and on June 2, 2023 — *i.e.*, the trips with Wang to Bangkok, Thailand and Fiji, respectively. (Chen Mem. 6; *see also* Dkt. 160-1 at 7 ("I could never imagine that the reason I come to America not because neither tour nor study. A 5 day business trip as an interpreter in Fiji had been turned into more than 2 years incarceration in United States.")) Chen further argues that she did not make deals and decisions on behalf of Amarvel Biotech. (Chen Mem. 7; *see also id.* at 6 ("Ms. Chen understood her role was strictly that of an interpreter. She had no responsibility or authority to make decisions regarding business matters such as pricing, negotiation, and product quantities.")). Chen's continued minimization flies in the face of abundant evidence to the contrary at trial, as set forth above. Indeed, as the Court determined in denying Chen's motion for acquittal or, in the alternative, a new trial, "the evidence showed that Chen was not 'merely acting as a translator'":

> In addition to her translation duties at the in-person meetings and video sessions, she played an instrumental role in Amarvel Biotech's advertising of fentanyl and methamphetamine precursors over the internet. It was Chen who registered the Amarvel Biotech websites that were used to advertise the sale of the precursor chemicals (*see* GX 301A to 301G (website registration records showing that amarvelbio.com and other affiliated websites were registered to Chen); GX 203-205, 207-209, 211-215, 217-220 (Amarvel Biotech webpages advertising precursor chemicals for sale)), and these websites explicitly advertised the sale of chemicals used "in the preparation of Fentanyl derivatives." (*See* GX 208, 212, 215, 218 (stating that the advertised chemical is an "[i]ntermediate in the preparation of Fentanyl derivatives") And Chen was well aware that the websites she registered and oversaw were being used to sell chemicals that are components of fentanyl. (*See, e.g.*, GX 713-721 (promotional material, including photos for l-boc-4-piperidone found on Chen's laptop); GX 722, 743-744 (same, for 1-boc-4-AP); GX 745 (text file found on Chen's laptop containing a

> product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives")) Moreover, there was evidence at trial that Google had sent emails to Chen notifying her that certain Amarvel Biotech advertisements had been taken down because they used the word "fentanyl." (See GX 810-813).

(Dkt. 156 at 37–38). On this basis, the Court correctly concluded that "Chen's conduct went well beyond mere translation." (Dkt. 156 at 38).

Chen next asserts in her sentencing memorandum that she is, "above all, Chinese," and her actions were merely consistent with (1) "Chinese business practices," — as informed by the Chinese philosopher Confucius — "to never embarrass anyone, refrain from disagreeing with someone in public, and let them save face," and (2) the significance of "Guanxi," described as the networking and building of trust among business partners in China (Chen Mem. 13-16):

> Her practices, as well as those of Mr. Wang, are classic Guanxi. Laying the foundation for a prosperous and profitable future through networking. [ . . . ] [N]either she nor Mr. Wang ever said no to the [DEA] Confidential Sources. Confucious lives! The goal is not to tell the customer no because having a public confrontation is not consistent with Chinese business practices, even if they really can't do it!

(Chen Mem. 15). Here, though, Wang and Chen, really could, and did in fact, "do it" — that is, in May 2023, they shipped more than 200 kilograms of precursor chemicals to California for CS Gil and CS Jose, believing that it would be used to make 50 to 55 kilograms of fentanyl.

To further illustrate the role of "Chinese business practices," Chen's sentencing memorandum avers that "Chinese businesspeople change tactics," pointing to the fact that, "for reasons that are unclear, the second shipment [in May 2023] had different chemicals and was shipped to a different city," and that "[n]o one knows why this happened." (Chen Mem. 16). That assertion is entirely divorced from the evidence at trial. Wang and Chen shipped a slightly different product (ortho-methyl-N-boc-4-AP instead of 1-boc-4-AP) because 1-boc-4-AP was out

of stock, (GX 401 at 58–59; Tr. 771, 819, 1104); and they sent it to Los Angeles because, as Yang explained in the group chat with Chen, CS Gil, and CS Jose, "New York, the United States, has been strict in checking the precursors of the 'final product' some time ago, so for the sake of safety, this time it is sent to California," (GX 402 at 18; Tr. 246–47, 572). The Court should summarily reject these baseless arguments by Chen, which demonstrate nothing more than a rewriting of reality and Chen's continued inability to accept responsibility for her conduct. *See, e.g.*, *United States v. Cox*, 299 F.3d 143, 149 (2d Cir. 2002) (affirming district court's denial of acceptance credit where the defendant's outlandish racial profiling claim was powerful evidence that [he] has not accepted his own personal responsibility" (internal quotation marks omitted)). After a nearly three-week trial, the jury concluded beyond a reasonable doubt that Chen was guilty on Counts Two and Five and rejected Chen's perjurious testimony proclaiming her innocence and attempting to plead ignorance of the illicit precursors sold by Amarvel Biotech and its affiliates or their use in the manufacture of fentanyl. As did the jury, the Court should reject Chen's continued efforts to lie to the Court, undermine the jury's sound verdict, and avoid any acceptance of responsibility for her actions.

Finally, Chen's sentencing memorandum makes a passing reference to the harsh conditions of confinement at the MDC as warranting a reduced sentence. (Chen Mem. 16 (stating that counsel "will discuss the harsh conditions of confinement . . . at the sentencing hearing" and citing, in part, Judge Furman's opinion in *United States v. Chavez,* F. Supp. 3d 227, 229 (S.D.N.Y. 2024))). As Judge Furman has more recently acknowledged, though, conditions at the MDC have improved since he issued his opinion in *Chavez*. *See* May 14, 2025 Sentencing Tr., *United States v. Reshard*, 24 Cr. 392 (JMF) at 24 ("I'm certainly more than familiar with the circumstances at the MDC, and the place has still much need for improvement, but it is also a lot better than it was in January of

[2024] when I wrote my opinion in *United States v. Chavez* that is cited in the defense's submission.").  And, notably, Chen's own letter to the Court extolls the MDC programming and opportunities of which, to her credit, she has availed herself while in custody.  (Dkt. 160-1 at 8–9).

<div align="center">

**<u>CONCLUSION</u>**

</div>

Wang's Guidelines range is 292 to 365 months' imprisonment, and Chen's Guidelines range is 324 to 405 months' imprisonment.  The gravity of the offense, the need for deterrence and incapacitation, and the aggravating factors specific to Wang and Chen would easily support a Guidelines sentence for each of them, in line with the 360-month sentence in *Swafford*.  Nevertheless, in recognition of the modestly mitigating personal circumstances of each defendant, including their ages and lack of criminal history, the Government respectfully submits that a sentence of at least 240 months' imprisonment for Wang and at least 216 months' imprisonment for Chen is necessary to serve the purposes of sentencing.

Dated: New York, New York
       July 24, 2025

<div style="margin-left: 50%">

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    ___/s/_____
       Alexander Li
       Kevin Sullivan
       Assistant United States Attorney
       (212) 637-2265 / -1587

</div>